Kelly, Appellant, *v.* Jones.

Argued October 7, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Ralph D. Tive,* for appellant.

*Edgar R. Casper,* Deputy Attorney General, with him *Walter E. Alessandroni,* Attorney General, for appellees.

OPINION BY MR. JUSTICE MUSMANNO, November 9, 1965:

Ambrose J. Kelly was appointed Field Auditor in the Pennsylvania Department of Revenue when that position was neither under executive nor legislative civil service. Sometime after his employment, the Executive Board of the Commonwealth brought his position within the ambit of executive civil service, and directed that as a condition for continued employment he, with other incumbents, had to pass a qualifying examination. He passed the test and in September, 1957, was notified that he now held regular or permanent status as a Field Auditor I in the Department of Revenue. In April, 1960, he was promoted to Field Auditor II with probationary status; and then in October, 1960 he was promoted to regular permanent status as Field Auditor II.

The Executive Board of the Commonwealth, in placing the plaintiff's position within the coverage of civil service, acted pursuant to the authority of the Civil Service Act of 1941 (Act of August 5, 1941, P. L. 752, 71 P.S. §741.1 et seq.) §212 of which provided that the service and facilities of the Civil Service Commission were to be made available to state government departments, boards and commissions not otherwise subject to the act, upon such terms and conditions prescribed by commission rules and regulations. In accordance with that section, the Executive Board of the Commonwealth directed various departments, boards and commissions of the Commonwealth to enter into agreements with the Civil Service Commission to administer the provisions of the Civil Service Act with respect to employees (such as Mr. Kelly) of government agencies not otherwise subject to the Act.

Thus Ambrose J. Kelly was enjoying the status of a permanent Field Auditor under this *executive civil service* when, in 1963 the legislature placed on the statute books the Act of August 27, P. L. 1257, 71 P.S. §741.1005, which brought within the coverage of *legislative civil service* thousands of state employees who theretofore had enjoyed either no civil service protection at all or only executive civil service protection. Under this amendatory Act of 1963, Kelly's status was changed from that of a regular or permanent employee, which he had enjoyed under executive civil service, to a probationary one. The 1963 Act further provided that any person serving such probationary period was, upon written notification of unsatisfactory work being submitted to the director by the appointing authority and countersigned by the Budget Secretary, subject to separation from the classified service without right of appeal.

On December 3, 1963, Kelly was notified by written notice of his dismissal from state employment effective December 19, 1963 for the assigned reason that his work performance had been found unsatisfactory. He promptly filed an appeal with the Civil Service Commission contending (1) that, having attained permanent status under executive civil service he enjoyed "full Civil Service prerogatives and protection and is entitled to a hearing on dismissal"; and (2) that his constitutional rights were violated by the Commission's denial of his right to a hearing. The Civil Service Commission refused to entertain his appeal, relying on the 1963 amendatory Act which forbids such appeal, as above stated. Mr. Kelly then filed a complaint in mandamus against the members of the Civil Service Commission asking that the court order the commission to hold a hearing upon his appeal from his dismissal from service. The commission filed preliminary objections in the nature of a demurrer which the court below sustained. An appeal to this Court followed.

The first question with which we are confronted is: Did the plaintiff, by virtue of his having attained permanent status under executive civil service, which entitled him to civil service protection and right of appeal upon discharge, acquire such a vested right that his status could not be later changed by the legislature? Put in another way, did the Amendatory Act of 1963 violate Mr. Kelly's constitutional rights in that it reclassified him from a permanent to a probationary employee who upon discharge had no right of appeal?

It must be stated at the outset that whatever authority the Executive Board of the Commonwealth possessed to bestow civil service protection upon Kelly was derived from an Act of the legislature, which Act permitted the board to exercise the indicated authority only with respect to those employees "not otherwise subject to the Act." Since all statutory law must be given a reasonable construction, we cannot hold that, by so providing, the legislature intended to thereafter forever bar itself from ever legislating regarding such employees. The legislature necessarily retained the power to withdraw the authority given the board and to legislate with respect to employees in Kelly's status.

The reasoning which this Court applied in the *Teachers' Tenure Act* Cases, 329 Pa. 213, applies equally well here: "In Home Building & Loan Assn. v. Blaisdell et al., 290 U.S. 398, at 435, it was said: 'Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.' Even if no mention were made in these contracts of the reserved power in the legislature to alter the school laws, it would be deemed to exist by essential implication.

. . .

"But the contract which the school teachers have with the State is a qualified contract. It is subject

to delimitation of its operation by subsequent statutory changes. When a state enters into contracts with private individuals for the performance of services as independent contractors, or for the loan of funds incidental to the carrying out of a governmental function, these contracts are protected against impairment by subsequent legislation. Thus city bondholders can object to the impairment of their contracts by the municipality or the legislature: [citing cases.] These, to a degree, partake of the nature of business or proprietary contracts. For example, municipal governments, acting in their governmental capacity, provide police and firemen to protect the safety and property of their citizens. The employment of these men is in the direct exercise of the governmental function and the employees are within the immediate path of its operation. In performing their services they represent the government and exercise a portion of its powers. But when a municipality contracts for the erection of a fire house or police station, the contractor is doing something which is merely auxiliary to the exercise of a governmental function. He neither represents the municipality, nor exercises municipal power. The contract which the municipality makes with the building contractor cannot be abrogated either by the municipality or the legislature. *The policemen and firemen, on the other hand, are not in a position to object to a change of their status by subsequent enactments. All rights which such employees may possess flow from the governmental power, here Artice X, Section 1, and are taken subject to its future exercise.*" (Emphasis supplied).

It follows, therefore, that Kelly, a government employee, held his position subject to the legislature's right to make future enactments which would bring his employment within the scope of legislative civil service carrying a status different from the one he previously enjoyed. In *Philadelphia Civil Service Commission v.*

*Eckles,* 376 Pa. 421, this court declared that the new Home Rule Charter provided a new uniform law applicable to *all* municipal employees, present and future: "Thereafter the Philadelphia Home Rule Charter was adopted on April 17, 1951, and became effective on January 7, 1952. On that date, also, the Civil Service Commission, pursuant to the provisions of the Charter promulgated the Philadelphia Emergency Civil Service Regulations. In Lennox v. Clark, 372 Pa. 355, 93 A. 2d 834, we said at pps. 366, 368, the '. . . provisions of the 1919 Act, in force on November 6, 1951, were quickly superseded by the provisions on these same subjects contained in the Home Rule Charter, which, duly authorized by the legislature and adopted by the vote of the Philadelphia electorate, became effective on January 7, 1952. Section 7-301 of the Charter provided that all officers and employes of the city, all departments, all independent boards and commissions . . . should, with certain exceptions, be under civil service . . . On January 7, 1952, therefore, *all* city officers and employes became immediately subject to these provisions of the Charter, . . .'."

In that litigation, as here, it was claimed that the new Home Rule Charter could only be prospective in operation and could not be given retroactive effect to an employee who was promoted prior to its effective date. This Court answered that contention: "To adopt appellant's contention would require us to hold that the status of each city employe as to appointment and promotion should be determined by the law in effect at the time of such appointment or promotion, thus creating various distinctions in administrative personnel, the elimination of which was a primary objective of the Home Rule Charter. We observed in the Lennox case that the Home Rule Charter came into being presumably in response to popular agitation for the correction of a patchwork system of government. From the occa-

sion of its adoption and from its provisions as well, we think it is clearly manifest that the intent of the new Charter was to provide a comprehensive system of personnel with uniform treatment of all employes, old and new, who enjoyed or obtained civil service status. Consequently the appellant was subject thereto.

"Under the Civil Service Regulations promulgated pursuant to and contemporaneously with the effective date of the new Charter, the probationary period was duly fixed at three months and it expressly covered promotions as well as initial appointments. Three months had not elapsed from the time of appellant's promotion when he was demoted. The demotion therefore occurred within the three months probationary period established under the new Charter, and was a valid exercise of the authority vested in the Fire Commissioner."

In *Jordan v. Kane,* 389 Pa. 1, this Court went so far as to hold that a government employee has no vested contractual right in his rate of compensation, stating: "Neither has the appellant a vested contractual right in his rate of compensation. There is no question of the 'power of legislative bodies to amend statutorily created rights affecting the conditions of public employment . . . although changes made will affect present . . . employes . . .' Philadelphia Civil Service Commission v. Eckles, 376 Pa. 421, 426, 103 A. 2d 761 (1954).

"Appellant, in effect, seeks a decision that the salary rights and conditions of employment of each government employe are unshakably determined by the most favorable law in effect during his employment. Were we so to hold, the resulting patchwork quilt of salary distinctions, preventing uniform treatment of all employees in a given classification, would cause inequities, impair morale, curtail experimentation in wage

and salary programming, and hence, impede the effective administration of government."[1]

A further question remains. Is the denial of a right of appeal upon discharge during probationary service a violation of Kelly's constitutional rights? First it is to be noted that an appeal is allowed under the Civil Service Act (§951(b)) where there has been discrimination because "of race, national origin or other non-merit factors," as set out in §905.1 of the Act. In Hunter v. Jones, 417 Pa. 372, we recently held that the appeals allowed under §951(b) were applicable to a probationary employee and that "If the complainant cannot sustain his allegations of discrimination, then his dismissal must stand without any right of appeal as to the validity of the determination of unsatisfactory work performance." We did not in that case pass upon whether that denial of a right to appeal constituted a deprivation of the probationary employee's right to due process of law. Under the facts alleged by Kelly, we cannot find that the denial of a right to appeal was a violation of his constitutional rights.

The denial of a right to appeal has been held to be a violation of constitutional rights, as in Wieman v. Updegraff, 344 U.S. 183, and Slochower v. Board of Higher Education of New York City, 350 U.S. 551, where the employee's discharge was based on grounds of disloyalty and he thus wore, in the view of the community, "a badge of infamy." In such case the employee is being deprived of his good name and reputation, which is indeed a property right subject to the constitutional protection of due process of law. But there is no such property right in government employ-

---

[1] In the Kane case the present writer distinguished the Eckles decision and dissented on the ground that "the legislation in question does not treat of classification of employees. The Act of 1953 had to do with employees disabled in service. They are necessarily a small number. The Legislature conferred upon those unfortunate persons certain rights."

ment per se which makes the denial of a right of appeal a violation of the due process clause.

Judgment affirmed.

Mr. Justice COHEN would vacate the judgment and direct an appeal to the Civil Service Commission.