William L. **LAFFERTY**, Vlad I. Thomas, Richard G. Adamany and George R. Adams, Individually and on behalf of others similarly situated, Plaintiffs,

v.

William L. **CARTER**, Individually and as President of Wisconsin State University at Whitewater, Wisconsin, et al., Defendants.

No. 70–C–63.

United States District Court, W. D. Wisconsin.

March 9, 1970.

Percy L. Julian, Jr., Madison, Wis., Shellow & Shellow, Milwaukee, Wis., for plaintiffs.

Charles Bleck, Asst. Atty. Gen., E. L. Wingert, Sp. Counsel, Madison, Wis., for defendants.

## OPINION AND TEMPORARY RE-STRAINING ORDER

JAMES E. DOYLE, District Judge.

Plaintiffs have moved for a temporary restraining order. This opinion is limited to that motion. The findings of fact and conclusions of law stated herein are limited to the purposes of that motion. They are subject to modification at later stages of the suit.

I find that each of the four plaintiffs is a full-time professor of English at the Wisconsin State University at Whitewater (three with the rank of full professor, and one with the rank of assistant professor; two with tenure under the

state statute, and two without statutory tenure). I find that on March 2, 1970, the defendant Carter, as president of the university, suspended each of the plaintiffs by causing to be delivered to him a letter, the contents of which follow:

"You are hereby suspended from all duties, without loss of pay, until a final decision is made as to your continued status.

"The reason for this suspension is that I find that harm to this University may result if you are continued in your present position.

"Pursuant to the provisions of Section 36.45, Wisconsin Statutes, during this period of immediate danger or disruption, the campus of Wisconsin State University—Whitewater, including buildings and facilities connected therewith are off-limits to you.

"Violation of this order may subject you to penalties provided by law for criminal trespass."

I find that during the academic year which began in September 1969, there had been considerable tension on the campus of the university, during which physical violence had occurred, property had been damaged, and a major building had been burned, in the opinion of the State Fire Marshal, by an arsonist or arsonists.

I find that starting February 25, 1970, and continuing until the suspension of the plaintiffs on March 2 (and thereafter), there had been considerable tension following a decision by the defendant Carter to relieve one Robert Burrows of his duties as chairman of the English Department; and that starting on February 25, and continuing to March 2, each of the four plaintiffs had publicly criticized the decision on Burrows, in the presence of many students, and had actively participated in meetings, processions, and demonstrations in protest against the decision. I find that the demonstrations included a boycott of classes by varying, but substantial, numbers of students on February 27 and March 2. I find that no physical violence or property damage had occurred during these demonstrations, although thousands of persons, mostly students, had participated in some of them. I find that none of the plaintiffs had engaged in physical violence or destruction of property during this period; that during this period none of the plaintiffs had urged or incited any other person to engage in physical violence or damage to property; and that plaintiffs have not been accused of engaging in, or inciting, such conduct.

I find that on March 2, against the background of the earlier disorders and tensions, the defendant Carter had become apprehensive that the demonstrations, although non-violent, might become violent. I find that on the afternoon of March 2, the defendant Carter decided to suspend each of the four plaintiffs; and that at this time he orally informed his administrative colleagues that the suspensions were required because each of the plaintiffs had been instrumental in the organization and continuation of the student boycott, and because the boycott had impaired to a considerable extent the operation of the university. I find that the written notices of suspension, set forth in full at the outset of this opinion, were prepared and delivered to the plaintiffs forthwith.

I find that the present suit in this court was commenced in the late afternoon of March 3 by the filing of a complaint and a motion for a temporary restraining order; that one of the allegations of the complaint was that the suspensions of the plaintiffs had occurred without prior specification of charges, notice of hearing, or hearing; and that the temporary restraining order sought was for immediate reinstatement of the plaintiffs. I find that at about the time this action was being filed in this court on March 3, the defendant Carter was signing letters to each of the plaintiffs asking that plaintiffs call a certain phone number for an appointment to appear in the office of a vice-president of the university "at an appointed time set

by [each plaintiff] on * * * March 4 * * * between the hours of 8:00 a. m. and 1:00 p. m. for an informal discussion of charges made against you and to permit you to make any statement you may wish to make"; I find that the letters contained no specification of charges; I find that the plaintiffs were not immediately accessible in Whitewater to receive the delivery of the letters, and that one or more of the plaintiffs actually received these letters at the police station in Whitewater at about 3:00 a. m., March 4. I find that during the evening of March 3, Mr. Julian (an attorney of record for the plaintiffs in this action in this court) who was in Madison, telephoned Assistant Attorney General Bleck (who has subsequently appeared as an attorney of record for the defendants in this action), who was also in Madison, at the court's request, to advise Mr. Bleck that this action had been commenced and that a hearing on the motion for a temporary restraining order had been scheduled for March 6; that at the time of this telephone conference, neither Mr. Julian nor Mr. Bleck knew the contents of the letters, not yet delivered to the plaintiffs, referring to a March 4 meeting and that Mr. Bleck knew little, and Mr. Julian nothing, of what defendant Carter intended a March 4 meeting to accomplish. I find that during said telephone conference on the evening of March 3, Mr. Julian and Mr. Bleck each expressed himself negatively about the holding of a meeting March 4 between defendant Carter and the plaintiffs; that later on the evening of March 3, Mr. Bleck telephoned defendant Carter, and advised defendant Carter that the March 4 meeting should be cancelled because the plaintiffs had retained counsel and had commenced this suit in this court; that the March 4 meeting was cancelled; and that by means of telegrams on March 4 the plaintiffs advised defendant Carter that they were prepared to meet with him if their attorney was permitted to attend. Thereafter, and as of the time of the March 6 hearing in this court on the motion for a temporary restraining order, no meeting, conference, or hearing, attended by the plaintiffs and by any administrative officer of the university, had been held.

The complaint alleges that the defendants, acting under color of state law, have deprived the plaintiffs of rights secured to them by the Constitution of the United States: first, the freedom of expression guaranteed to them by the First and Fourteenth Amendments, and, second, the right to procedural due process guaranteed to them by the Fourteenth Amendment.

Jurisdiction is present under 28 U.S. C. § 1343(3) and (4), and 42 U.S.C. § 1983.

█ I find and conclude that the injury to the plaintiffs resulting from the suspensions is irreparable. It is true that the suspensions are without loss of pay. However, when a professor is notified in writing by the university president that "the campus * * * including buildings and facilities connected therewith are off-limits to you," both the immediate consequences to the professor, and the long-range consequences to him in terms of his career and his professional standing, are obviously of major proportions and probably not measurable in financial terms.

As against the injury to the plaintiffs flowing from the suspensions, there is to be considered the consequences to the named defendants in this action, and to others, which would flow from a temporary order requiring the reinstatement of the plaintiffs. To test these consequences, it is not unreasonable to assume, from the viewpoint of the defendants, based upon plaintiffs' behavior, that with unlimited access to the campus and the students, the plaintiffs may actively undertake to preserve or to re-create a setting in which further student boycotts of classes—not only in the English department but in other departments—may occur.

In the presence of these competing considerations, the decisive factor emerges: namely, an evaluation of the

plaintiffs' ultimate chance of success in this lawsuit. Earlier I undertook to summarize the plaintiffs' contentions: (1) a "substantive" contention that these plaintiffs have been deprived of rights secured to them by the First and Fourteenth Amendments; and (2) a "procedural" contention that the sanction of suspension has been imposed without the rudiments of specification of charges, notice of hearing, and hearing.

With respect to the "substantive" contention, I imply no decision on the merits, but I conclude that the plaintiffs' chance ultimately to prevail is not sufficiently clear to support a temporary order requiring their reinstatement. It has been clearly decided that the employment of a teacher in a public school may not be terminated for the reason that he has exercised freedom of expression guaranteed to him by the First and Fourteenth Amendments. Pickering v. Board of Education, 391 U.S. 563, 88 S. Ct. 1731, 20 L.Ed.2d 811 (1968); McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968). For the reasons I have stated, this protection must reach a suspension, even without loss of pay, as well as a termination. The central question, however, is to define the limits of the teacher's freedom of expression when his statements and actions are directed to policies and functions of the educational institution of which he is a part. For example, he may be free to express his disagreement with a policy enunciated by an officer of the university authorized to enunciate it, but he may not be free to encourage other teachers or students to disobey the policy. To conclude that he may not be "free" to engage in certain speech and action of this sort is not to say that the sanction of imprisonment, for example, may be imposed upon him constitutionally, but it is to say that the constitution may not protect him from suspension or termination of employment. In *Pickering*, the Court was careful to observe: " * * * [T]he State has interests as an employer in regulating the speech of its employees

that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S., at 568, 88 S.Ct., at 1734.

Ultimately, in order to determine this First Amendment issue, it would be necessary to ascertain: (a) Upon what alleged conduct of the professors did the defendants rely in ordering the suspension? (b) Assuming that the professors did in fact engage in the conduct alleged, are they protected by the First Amendment against the sanction of suspension based upon such *conduct*? (c) If they are not so protected, then did they or did they not engage in the conduct alleged? On the present state of the record in this court, none of these questions can be answered.

This brings us to the plaintiffs' second contention here, namely, that the suspension has been imposed without the procedural due process guaranteed by the Fourteenth Amendment. With respect to this contention, plaintiffs clearly enjoy a good prospect of ultimate success in this action. Prior to the action of the defendant Carter in suspending them, none had been notified of the nature of the charges against him, none had been given notice that he could be heard on the charges, and none had in fact been heard. Even the notice of suspension itself failed to state in any intelligible way the basis for the action; to say that one finds that harm to the university may result if a professor is continued in his present position is to tell him nothing which permits him to defend himself. It is difficult to conceive a more complete failure to accord the rudiments of due process of law.

In Stricklin v. Regents, D.C., 297 F. Supp. 416 (1969), I decided that a student may not be temporarily suspended from a state university, pending a "full hearing," except for reasons relating to the physical well-being of the student himself or the safety and well-being of other persons or university property. I held that even when such reasons are present, he may not be temporarily suspended without a prior "preliminary

hearing" in which he would be provided a minimal opportunity to learn the charge against him and to make some response to the charge. I held that such a preliminary hearing prior to an interim suspension may be dispensed with only if it is impossible or unreasonably difficult to accord it prior to suspension; even when it is impossible or unreasonably difficult to accord a preliminary hearing prior to an interim suspension, I held that it must be provided at the earliest practical time following such interim suspension.

■ It may be, as I have suggested above, that the range of expression protected by the First Amendment differs as between students and professors in a state university; it may be that the professors' range is the narrower. But with respect to the right to procedural due process, the protection to be afforded a professor can hardly be less than that afforded a student, and probably should be greater.

Applying the *Stricklin* test to this present situation, I conclude that even if all the allegations of all of the affidavits filed by the defendants, hearsay included, were taken as true, they constitute a rather meager showing that, pending a full hearing, the continued presence of any of the plaintiffs constituted a threat to the physical safety or well-being of any person or a threat to university property. But with respect to the impossibility or unreasonable difficulty of affording the plaintiffs a preliminary hearing prior to suspension, the defendants have made no showing whatsoever.

In a brief filed today, counsel for the defendants have advanced an extraordinary contention: that the use of the word "suspended" in the defendant Carter's letter of March 2 was "unfortunate"; that the legal relationship of the plaintiffs to the university remains wholly intact and unimpaired; and that the order not to enter upon the campus and not to enter any university building or facility, upon pain of criminal prosecution, is to be equated with routine administrative directions to faculty members concerning the performance of their duties.

■ The March 2 letters advised the plaintiffs that they were "suspended from all duties, without loss of pay, until a final decision is made as to your continued status," and that the campus and the university buildings and facilities "are off-limits to you." I find that the effect of this order, so long as it continues in force, is totally to separate each of these university professors from the mainstream of his occupation as a teacher and significantly to separate him from the mainstream of his occupation as a scholar and researcher. I also find that the order has now continued in effect for seven days. I reaffirm my finding and conclusion, stated earlier in this opinion, that the injury to the plaintiffs which has resulted from the suspensions, and which will result from a continuation of the suspensions, is irreparable and major. To impose such consequences upon a university professor, without affording a single basic element of procedural due process, cannot seriously be compared to an administrative direction to use a specified classroom for a lecture.

Accordingly, upon the basis of the entire record herein, it is hereby ordered that each of the plaintiffs herein be reinstated as a member of the faculty of Wisconsin State University at Whitewater, effective forthwith, with the same rights, privileges, and immunities which attached to their status as faculty members prior to their suspension March 2, 1970; provided, however, that nothing in this order shall be construed to prevent the defendants, or their agents, from proceeding to consider and impose an interim suspension of any of the plaintiffs, on the condition that there are observed the requirements of procedural due process stated in this opinion, in the opinion in Stricklin v. Regents, D. C., 297 F.Supp. 416 (1969), and the opinion entered by this court January 7, 1970, in Buck v. Carter, D.C., 308 F. Supp. 1246; and provided, further, that nothing in this order shall be construed

to prevent the defendants, or their agents, from proceeding with any other proceedings looking toward more extended suspension or termination of the university employment of any of the plaintiffs, on the condition that there are observed the requirements of procedural due process. .