**Harold W. GRAUSAM, Jr., Appellant,**

v.

**Henry S. MURPHEY, M.D., individually and as Medical Director of Henry Landis State Hospital, et al., Appellees.**

**No. 18547.**

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 1970.

Decided Sept. 7, 1971.

Alan M. Lerner, Cohen, Shapiro, Berger, Polisher & Cohen, Philadelphia, Pa., for appellant.

Morris J. Solomon, Asst. Atty. Gen., Department of Health (Joseph L. Cohen, Asst. Atty. Gen., Edward Friedman, Counsel Gen., William C. Sennett, Atty. Gen., Harrisburg, Pa., on the brief), for appellees.

Before FORMAN, SEITZ and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

By a verified complaint filed in the District Court for the Eastern District of Pennsylvania appellant, Harold W. Grausam, Jr., brought this suit under 42 U.S.C. § 1983, 28 U.S.C. § 1343, and the First and Fourteenth Amendments to the United States Constitution, alleging that he had been discharged from his position as Director of the Social Services Department at the Henry R. Landis State Hospital, Philadelphia, Pennsylvania,[1] (hereinafter, the Hospital) in violation of the First and Fourteenth Amendments. He named as defendants Henry S. Murphey, M.D., Medical Director of the Hospital; Harold E. Coder, M.D., Director, Division of Chronic Respiratory Diseases of the Pennsylvania Department of Health; John E. James, Director of Personnel of the Pennsylvania Department of Health; and Thomas W. Georges, M.D., Acting Secretary of Health of the Commonwealth of Pennsylvania.

Attached to the complaint was a copy of a leaflet entitled "Fight the Cut-Backs—Win Higher Wages" which appellant had distributed to Hospital employees and others in an area close to the Hospital grounds after working hours on July 10, 1969; a Performance Evaluation Report, executed on July 16, 1969, which rated appellant's overall work performance as "unsatisfactory";[2] and a letter of August 28, 1969, which informed appellant that his employment with the Hospital would terminate at the close of business on September 9, 1969 because of "the unsatisfactory nature of your work performance."

The complaint alleged that appellant's unsatisfactory rating and dismissal had been substantially motivated by the distribution of the leaflet, and requested (1) a declaration that his discharge was effected in violation of his First and Fourteenth Amendment rights; (2) an injunction to prevent any future Hospital action in violation of his rights; (3) an order that the Performance Evaluation Report be expunged from all official records of the Commonwealth of

---

1. This hospital is maintained by the Department of Health of the Commonwealth of Pennsylvania for the treatment of tuberculosis.

2. The Performance Evaluation Report rated appellant as follows: "quality of work"—"good"; "work habits," "dependability," "quantity of work," "initiative," "administrative ability"—"fair"; "analytical ability," "quality as supervisor," "relationship with people"—"unsatisfactory"; "overall rating"—"unsatisfactory."

The instructions for the execution of the Report contains the following:

"Because the importance of different performance factors varies from job to job, there is no prescribed formula for averaging the factor ratings to arrive at an overall rating. However, if the overall rating is to be accurate it must be consistent with all the factor ratings."

Pennsylvania; and (4) damages, counsel fees and costs and any other necessary or appropriate relief.[3]

At the same time appellant filed a Motion for Preliminary Injunction, incorporating the provisions and prayers for relief recited in the verified complaint, and a hearing thereon was held on September 18, 1969. At the hearing appellant rested his case on the complaint and papers attached thereto, and expressed his willingness to have both preliminary and permanent relief determined then, but this course was rejected by the appellees. The District Judge then orally denied the Motion for Preliminary Injunction and held the case over for a date to be fixed for final hearing, offering to file written findings of fact and conclusions of law.

Appellant meanwhile took a timely appeal to the Pennsylvania Civil Service Commission[4] which held a public hearing on October 30, 1969.[5] Thereafter, on December 12, 1969, the parties stipulated that the transcript of the State Civil Service Commission hearing be incorporated into the record then before the District Court, and that the District Judge rule on all of the relief prayed for in the complaint as if on final hearing.

On December 19, 1969, the District Judge denied appellant's motion for a preliminary and permanent injunction, concluding that "(t)he plaintiff has failed to sustain his burden of showing that his exercise of his rights under the First and Fourteenth Amendments was a substantial factor in inducing his dismissal."

The record indicates that on December 10, 1968, appellant was appointed Director of the Social Services Department of the Hospital. The appointment, made on an emergency basis under § 741.606 [6] of the Civil Service Act, was to expire early in March. On March 6, 1969, appellant and Dr. Harold E. Coder met to consider whether appellant should be retained in his position in a probationary status. The next day, Dr. Coder sent a letter to Mr. James expressing dissatisfaction with appellant's work performance, but recommending his probationary appointment. The letter stated in part:

"I have discussed Mr. Grausam's performance with him yesterday and indicated to him certain deficiencies, such as irregular duty attendance and difficulty in keeping pre-arranged appointments. I also emphasized the importance of the Social Service Department maintaining good communications and amicable relations with other departments in the hospital."

Dr. Coder further wrote that "(i)f, during the next three months, Mr. Grausam's performance does not improve materially I will not hesitate to recommend his termination." Mr. James thereafter notified appellant, by letter of March 12, of his appointment to probationary status, adding the admonishment that "The record indicates that Dr. Coder * * *

---

3. The complaint was replete with accusations generally attacking the administrative and medical procedures of the Hospital as ineffective and improper, but these are irrelevant to this action.

4. Appellant's appeal was taken pursuant to § 741.951(b) of the Pennsylvania Civil Service Act, 71 P.P.S. § 741.1, et seq. See note 31, *infra*.

5. The Commission upheld appellant's discharge after being presented with substantially the same arguments and evidence presented here.

6. Section 741.606 (Emergency appointments) provides in pertinent part:

"Any appointing authority or any subordinate authorized by him may, to prevent serious impairment of the public business when an emergency arises and time will not permit securing the authorization from the director for the appointment of a certified eligible, appoint any qualified person during the emergency for a period not exceeding thirty days and may with the approval of the commission be extended for a further period not to exceed thirty days * * * Persons thus appointed shall be known as emergency employes. Appointing authorities shall forthwith report to the director all emergency appointments, and such appointments shall not be renewed."

on March 6, 1969, discussed deficiencies in your performance with the positive intent to alert you to the need to maintain good communications with the other departments in the hospital and to maintain regular attendance."

On July 10, 1969, appellant distributed a leaflet, mentioned above, which, in essence, urged hospital personnel to organize against proposed state budget cuts which allegedly would curtail essential hospital services to Philadelphians, and severely affect the job security and wages of hospital and other health care workers. The next day appellant was called in to Dr. Coder's office and questioned about the leaflet and its advocacy of a "sick-in" by Hospital employees.[7] On July 16, Dr. Henry S. Murphey sent to appellant the Performance Evaluation Report;[8] the letter of August 28 dis-

7. The leaflet stated in part:
"* * * When hospital workers demand $100/week, really a minimum decent salary, they will be leading a fight welcomed by thousands of workers in the city who want the same thing. Many state workers, who are planning a 'sick-in' on July 31st over needed wage increases, do not make $100/wk. and they will be able to give support to the actions of hospital workers. Organizing around this program will enable hospital workers to lead the building of a very strong movement, because it will have the strength of many parts of the population. Already three unions—the United Electrical Workers, District 76 of the Retail Clerks, and 1199 of the Hospital Workers, have pledged support of a $100/week minimum wage campaign.

"We urge hospital workers to consider these ideas and organize meetings to discuss them. We will be holding a *city-wide meeting* this Sunday which we urge hospital workers to send representatives to. From that meeting we hope to plan a demonstration in support of the demands of our program—more pay and decent working conditions for health-care workers, and better services —don't close the hospitals! Please contact us for any further information."

8. See note 2, supra. A letter, from Dr. Murphey to appellant, accompanying the Performance Evaluation Report stated as follows:

"Following our conference on Thursday, July 10, 1969, it seems necessary to inform you of certain responsibilities you have as a Department Head in Landis Hospital.

"1. This hospital is run for one purpose, namely: The care of persons who have tuberculosis.

"a. Any activity that results in impaired or potentially impaired patient care is inimical to the welfare of this hospital and the patients.

"b. Any activity that disturbs personnel working in the hospital will eventually result in impaired patient care, (specifically when you encourage personnel to be dissatisfied with their position.)

"c. As a supervisor, and especially a Department Head, you are a key person in the Administration of this hospital. Your actions are taken as an example to be followed by subordinates, (specifically, handing out literature in which a general 'sick-out' is apparently a suggested action for employees.)

"d. This hospital is run under the Department of Health, of which Thomas W. Georges, Jr., M.D. is Secretary. He, under the Governor of the Commonwealth, sets the policies by which this hospital is run.

"e. Some of your actions and activities are disturbing to other department heads. You seem to agitate many of the hospital personnel and this detracts from their efficiency. "Unless you can work in harmony with other department heads you cannot give the best social service, (specifically, when you typed a letter to a physician telling him your department was too busy to type summaries and he should present them to you typed. At that time your typed letter was as long as the summary in question.) You have not established yourself as a member of the Medical Team.

"f. Your lack of concern for the patients when employees stage a mass sick-out, stating that a little suffering for long gains seemed permissible, does not reflect an attitude that is patient oriented. The gains were not for the patients.

"g. Your refusal to accept the fact that tuberculosis is transmitted by persons with sputum containing tubercle baccilli with a consequent hazard to the Public Health is disturbing to the medical personnel.

missing appellant followed. Appellant shortly thereafter filed this suit.

Appellant challenges the finding of the District Judge that he did not sustain his burden of proof to show that his removal was substantially motivated by the distribution of the leaflets. He asserts further that in reaching this determination, the District Judge relied on reasons not presented by the appellees, thus violating the rule that a reviewing court:

> "must judge the propriety of (administrative) action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." [9]

 Where, as in the present case, a violation of protected First Amendment freedoms has been alleged, a comprehensive review of the entire record is important to assure that no intrusion upon them has occurred. At the same time, the findings of fact of the District Judge are entitled to substantial weight, and, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, must be upheld unless they are found to be clearly erroneous:

> "A district court's finding of fact should be construed liberally and found to be in consonance with the judgment, so long as that judgment is supported by evidence in the record." Zimmerman v. Montour Railroad.[10]

In the present case the District Judge found the evidence introduced by the appellees sufficient to support the appellant's Performance Evaluation rating of "unsatisfactory," and to overcome appellant's allegation that the distribution of the leaflet was the cause of his unsatisfactory rating. In order to determine whether these findings are supportable, it is necessary to turn first to the Penn-

"2. All of the above factors, and some not mentioned, make me question your judgment in matters pertaining to the hospital care of patients with tuberculosis. It has also led some other department chiefs to wonder whether or not you are working with them. This detracts from the efficiency of the Social Service Department.

\*　　\*　　\*　　\*　　\*

"4. This matter has been discussed with Dr. Harold E. Coder who gave you an admonition in March 1969."

9. Securities & Exchange Commission v. Chenery Corporation, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (Chenery II). This rule was enunciated first in Securities and Exchange Commission v. Chenery Corporation, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (Chenery I). In Chenery I, the S.E.C. had invalidated the over-the-counter purchase of shares by officers, directors and controlling stockholders of a holding company while it was in the process of reorganization, as being detrimental to the public interest on fiduciary principles. The Court of Appeals set aside the Commission's order, 75 U.S.App.D.C. 374, 128 F.2d 303 (1942). The Supreme Court also held the Commission's order invalid, finding that it was grounded on a misinterpretation of judicially established equitable principles, which did not impose the high standard fixed by the S.E.C. At the same time, the Court declined either to substitute its own standard of fairness, holding that Congress had entrusted the making of such policy determinations to the Commission, or to uphold the order on the basis of new grounds introduced to support it, stating that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." (at 95, 63 S.Ct. at 462).

Chenery II arose after the Commission's denial of an application for an amendment to the reorganization plan. Following the rule of Chenery I, the Court upheld the S.E.C.'s action as based on proper and relevant considerations. The Chenery rule has largely been invoked in cases involving appeals from federal agency orders. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Austin v. Jackson, 353 F.2d 910, 912 (4th Cir. 1965); Texaco, Inc. v. F.P.C., 412 F.2d 740, 744 (3rd Cir. 1969). See also Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

10. 296 F.2d 97, 98 (3rd Cir. 1961), cert. den. 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed. 2d 793 (1962).

sylvania Civil Service Statute,[11] which sets out the permissible grounds for the removal of a probationary employee. Section 741.603 [12] provides that, unlike the regular employee in the Service, who may be dismissed for good cause only,[13] a probationary employee may be discharged if, in the *opinion* of the appointing authority, he does not perform his duties satisfactorily, or is undependable. Examined in light of this statutory requirement, the record indicates that the reasons introduced by the appellees to justify their removal of appellant were sufficient to satisfy the statutory standard, support ·the overall unsatisfactory rating of the Performance Evaluation Report, and successfully rebut appellant's allegation.

The record discloses that Dr. Murphey testified that appellant had alienated himself from staff doctors and nurses so that they felt they could not secure assistance from him. This testimony was supported by Dr. Coder's letter of March 7, 1969, which specifically referred to appellant's failure to maintain good communications and amicable relations with other departments in the Hospital, and by his testimony that during monthly visits to the Hospital department heads had complained to him about appellant's behavior.[14] In addition, the appellees alleged that appellant had been late to

work three or four times, and that he had not been present at prearranged appointments and a department conference. This was conceded by appellant, but he stated that he had not been informed of the appointments and attributed his lateness to inclement weather conditions. Dr. Murphey testified further that appellant, who had a typist, had refused to type a short summary for a doctor who had none. A letter of June 23, 1969, written by appellant and stating his declination to do the typing, was submitted in evidence.[15] Other testimony was admitted to show that, in the appellees' opinion, appellant opposed some of the professional practices of the staff doctors: that he had disagreed with the Chief Nurse and with the Assistant Chief of Medicine on the medicine prescribed for a patient; that he had encouraged patients with positive sputum to leave the Hospital on pass, despite the contrary indications of medical practice and procedure; and that he had refused to accept the fact that tuberculosis is transmitted by sputum containing tubercle bacilli. Appellant denied these allegations in his rebuttal testimony and introduced documents written by him to refute the allegations of unsatisfactory work performance.[16]

Dr. Murphey and Dr. Coder, on the other hand, persistently denied that the

11. 71 P.P.S. § 741.1 et seq.

12. Section 741.603 provides in pertinent part:

"(a) * * * At any time during his probationary period, the appointing authority may remove an employe if in the opinion of the appointing authority the probation indicates that such employe is unable or unwilling to perform his duties satisfactorily or that his dependability does not merit his continuance in the service."

13. Section 741.807.

14. Dr. Coder's testimony was taken at the hearing before the Civil Service Commission, stipulated as part of the record in this case.

15. The circumstances alluded to a memorandum of a staff member of appellant to Dr. Shields, a Hospital doctor, to furnish an analysis of a patient's condition, which was necessary to facilitate his

transfer to another State institution. Dr. Shields replied by stating his analysis in longhand at the foot of the memorandum. Appellant declined to have an employee of his office type the analysis, asserting, among other things, that it was properly the responsibility of Dr. Shields to make the necessary report. Dr. Murphey insisted that appellant's declination was typed and longer than the doctor's comment. He was evidently mistaken about the typing, as appeared when appellant himself introduced his handwritten letter to Dr. Shields which, however, contained his declination described by Dr. Murphey.

16. They were: (1) a memorandum dated March 5, 1969, from appellant to one Dr. Lampe, explaining that appellant was experiencing difficulties in his relationship with the Personnel Office, and requesting assistance to help him improve communications with that office, (2) a memorandum dated March 6, 1969, from

distribution of the leaflets was a substantial cause of, or a motivating factor in appellant's dismissal. Dr. Murphey flatly discounted the incident involving the leaflet as the cause of appellant's "unsatisfactory" rating, and stated that:

> "Prior to his (appellant's) distribution of this leaflet I had told him that whatever he wanted to do outside of the hospital in distributing leaflets was his business and I was not concerned with that factor; that he should not do this sort of thing in the hospital, but what he did outside the hospital was his business."

He conceded that appellant had been questioned about the leaflets the day following their distribution, stating that it was necessary for Hospital administrators to plan for contingencies that might arise with respect to Hospital personnel, and that Hospital employees had previously staged a walk-out during which the Hospital was forced to put on pass 200 patients, 100 of whom indicated positive sputum. Dr. Coder testified to the same effect. In view of these circumstances, it was neither unreasonable for Dr. Murphey to question appellant about the mention of a "sick-in" in the leaflets, nor startling that he referred to this in the Performance Evaluation Report. The reasons and evidence introduced by the appellees are found to be persuasive of the appellees' overall rating of "unsatisfactory" accorded appellant. On a review of the entire record, it is concluded that the determination of the District Judge that appellant's bur-

den of proof was not sustained is supported by the evidence, and the District Judge did not err in so finding.[17]

■ Nor is appellant's argument persuasive that, within the meaning of the *Chenery* rule, the District Judge relied upon independent grounds, not asserted by the appellees, in his reasoning. Specifically, appellant first objects to language in the District Judge's discussion that:

> "* * * we are not persuaded that plaintiff's role in distribution of the leaflet was the reason that Murphey was induced to rate the plaintiff's overall performance as unsatisfactory, or that the performance evaluation was the cause of the letter of dismissal over a month later."

and, secondly, that:

> "We think the inference to be drawn from the plaintiff's letter of dismissal, is that his performance did not, in the words of Mr. (sic) Coder's March 7 letter, 'improve materially' from March to August so that his probationary appointment lapsed."

Appellant argues that the above language demonstrates that the District Judge found as the cause for his removal his failure to improve by August as compared with his earlier work performance. He alleges that the appellees did not rely on such a ground to justify his rating of "unsatisfactory," or his discharge. Examination of the District Judge's complete discussion does not support this interpretation of his reasoning.

appellant to Dr. Murphey, informing him that arrangements had been made for three meetings at the Institute of Alcoholism to familiarize "our staff" with current thinking about the nature of alcoholism, (3) a memorandum dated August 4, 1969, entitled "Standards of Casework Performance," setting out the elements and goals of casework to improve casework performance, (4) an undated memorandum entitled "Reorganization of the Social Service Department," setting out appellant's suggestions for more efficient administration of the Social Service Department.

17. Having determined that appellant was not discharged for engaging in protected

First Amendment activity, it is unnecessary to reach his argument that public employees may not be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest * *," as a condition to employment, for which appellant has cited Pickering v, Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), citing e. g., Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). See Kiiskila v. Nichols, 433 F.2d 745 (7th Cir. 1970).

First, the record indicates that Dr. Murphey testified that the Performance Evaluation Report was simply "a factor" in appellant's discharge, and it was not error for the District Judge to refuse to assign it as the operating "cause" for the letter of dismissal which followed over one month later. Secondly, the section of the District Judge's discussion omitted by appellant from his argument indicates that he relied only on the grounds presented by the appellees in his reasoning. Immediately following the sentence which constitutes appellant's first objection, the District Judge stated that "the plaintiff's tenure was tenuous to say the least several months before the leafleting incident," and he recounted the "strong reservations" with appellant's performance expressed in Dr. Coder's letter of March 7, 1969. He stated further that "(t)he discussion accompanying Dr. Murphey's rating indicates a similar opinion reached for similar reasons," that is, that Dr. Murphey found appellant's performance unsatisfactory for substantially the same reasons as had Dr. Coder—a determination supported both by the evidence, and by the Performance Evaluation Report's specific reference to Dr. Coder's March 7 letter.[17a] Although not couched in the clearest manner, the District Judge's language drawing the inference that appellant's performance did not "materially improve," can reasonably be taken to mean only that, in the opinion of the appellees, appellant's overall work performance had been found unsatisfactory over the period from March to August, and not that the District Judge had engaged in a comparison of his earlier with his later work performance. Viewed in this light, the present case is unlike that of Johnson v. Branch,[18] upon which appellant places substantial reliance. In *Johnson*, a teacher whose work had been high-ly rated for twelve years sought reversal of her school committee's refusal to renew her contract. The school committee grounded its reason for nonrenewal on her infractions of the school rules. The District Court dismissed her complaint finding that the plaintiff's civil rights activities were the cause of the school's failure to rehire her. On the grounds that this was not the reasoning or logic presented by the school committee for its failure to renew the contract, the Court of Appeals reversed, relying on the *Chenery* rule.[19] It is apparent that the obvious difference in the reasoning of the District Judge and the administrative body in *Johnson* cannot be found in the present case.

The foregoing reasons prompt the conclusion that the District Judge correctly determined that the appellant did not sustain his burden of proof to show that his discharge was motivated by his activities protected by the First Amendment, and that in so holding the District Judge relied on the grounds and logic presented by the appellees for appellant's discharge.

Appellant also contends that the requirements of due process of the Fourteenth Amendment were violated because he was not presented with a specific list of reasons, nor an opportunity to rebut them at a hearing, prior to his removal.[20] The letter of August 28, 1969, informing appellant of his dismissal, stated that the action was taken because of "the unsatisfactory nature of your work performance," and contained notice of a right to an appeal and a public hearing before the Pennsylvania Civil Service Commission. Examined in the light of the rights afforded him under the Pennsylvania Civil Service Act as a probationary employee, appellant's contention that this procedure was violative of due process is not persuasive.

---

17a. See note 8, *supra*.

18. 364 F.2d 177 (4th Cir. 1966), cert. den. 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967).

19. The court stated that "the record offers no objectively substantiated facts known to the Board with regard to the plain-tiff's civil rights activity which would justify the Board's action as found by the (district) court." 364 F.2d at 181.

20. This issue was raised in the District Court but was not discussed by the District Judge in his Findings of Fact and Conclusions of Law.

The Act provides that "(n)o appointment to a position in the classified service shall be deemed complete until after the expiration of a probationary period," [21] and that a probationary employee may be dismissed "at any time before the expiration of the probationary period," [22] which may last from six to eighteen months.[23] Unlike a regular employee,[24] who must be furnished with written notice of the reasons for dismissal,[25] and may not be removed except for just cause,[26] a probationary employee may be discharged if "in the opinion of the appointing authority" he is "unable or unwilling to perform his duties satisfactorily or * * * his dependability does not merit his continuance in the service."[27] A probationary employee must be furnished written notice of official action.[28] There is, however, no requirement that the appointing authority support his opinion of unsatisfactory work performance with a statement of reasons.

Upon discharge, a regular employee may appeal from an unfavorable evaluation of the merits of his work performance.[29] A probationary employee is not entitled to an appeal on those grounds. He is, however, granted a right of appeal [30] to show that he has been the subject of discrimination on the basis of non-merit factors.[31] The courts of the Commonwealth of Pennsylvania have so interpreted the statutory provisions governing probationary employees.[32]

It is apparent from this outline that the statutory scheme enacted by the Pennsylvania legislature classifies the procedural rights of employees in terms of their status in the Civil Service. The procedure appellant seeks is essentially that provided for the regular, but not the probationary, employee.[33] In effect, his contention amounts to an argument that, in order to comply with the requirements of due process, the regular and probationary employee must be provided with the same procedural rights upon discharge.

■ Since the time when the rights of public employees were narrowly limited on the principle that public employment was an unprotected privilege and

21. Section 741.3(t) provides that " 'Probationary period' means a preliminary period of employment prior to permanent appointment of an employe for the purpose of determining his fitness for permanent employment."

22. Section 741.804.

23. Section 741.603.

24. Section 741.3(k) defines a regular employee as an "employe who has been appointed to a position in the classified service in accordance with this act after completing his probationary period."

25. Section 741.950.

26. Section 741.807.

27. Section 741.603. See note 12, *supra*.

28. Section 741.950.

29. Section 741.951(a).

30. Section 741.951(b) provides that an appeal must be taken within 20 calendar days of the alleged violation, and that the Civil Service Commission must promptly hold a public hearing thereon. If the final decision is in favor of the aggrieved party "the commission shall make such order as it deems appropriate to assure

the person such rights as are accorded him by this act."

31. Section 741.905a provides in pertinent part:

"No officer or employe of the Commonwealth shall discriminate against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action with respect to the classified service because of political or religious opinions or affiliations because of labor union affiliations or because of race, national origin or other non merit factors."

Section 741.951(b) creates a right of appeal for any employee who believes he has suffered discrimination within the terms of § 741.905a.

32. See Hunter v. Pa. Civil Service Comm'n, 422 Pa. 158, 220 A.2d 879 (1966); Kelly v. Jones, 419 Pa. 305, 214 A.2d 345 (1965); Hunter v. Jones, 417 Pa. 372, 207 A.2d 784 (1965).

33. Indeed, insofar as appellant seeks a hearing prior to discharge, he requests greater rights than those afforded regular employees, for there is no requirement in the Act that a regular employee be granted a hearing prior to discharge.

not a property right,[34] the focus of judicial inquiry has shifted; instead of construing the requirements of due process in terms of the right or privilege of the employee to hold public employment,[35] the courts have turned to an examination of the reasonableness of governmental action.[36] It is now recognized that irrespective of questions concerning an abstract "right" to public employment:

> " * * * constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." [37]

In any given case, the rule of due process is one of fairness under the circumstances, and the determination of what procedures are required involves a balancing of the interests of the employee and the government:

> "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." [38]

In the present case the question arises, then, what interest, right or privilege of appellant was involved in his employment? By the very fact that he was on probation, his eligibility and right to hold the position were in the process of determination. Any interest in or right to

his post during probation was at best conditional, and, absent a discriminatory severance, dependent upon his own performance in proving his ability to successfully satisfy the demands of that position.

The interest of the State, on the other hand, in obtaining employees who satisfactorily provide the important public services performed by it, and in replacing those who do not, is considerable. In the present case, the substantial interest of the public and the state involved in the orderly and efficient administration of a hospital for the care and treatment of tubercular patients is manifest.

Due process has long been held to require both notice of official action, and a hearing providing the opportunity to challenge the fairness of that action.[39] It has been recognized, however, that:

> "(t)he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation (citations).
>
> ' "Due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' " [40]

In providing for a period of probation to test any employee's ability and performance, the Pennsylvania Civil Service Act establishes a corollary right in the appointing authority to discharge a probationary employee if in his *opinion* the employee performs unsatisfactorily or is

34. E. g., McAuliffe v. City of New Bedford, 155 Mass. 216, 220, 29 N.E. 517 (1892), in which Justice Holmes made his oft-quoted comment: "(t)he petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."

35. See Bailey v. Richardson, 86 U.S.App. D.C. 248, 182 F.2d 46 (1950), aff'd by an equally divided court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951).

36. See Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ; Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed. 2d 810 (1967) ; Schware v. Board of Bar Examiners of the State of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) ; United Public Workers of

America v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) ; Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964).

37. Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952).

38. Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

39. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) ; In re Central R. Co. of New Jersey, 136 F.2d 633, 639 (3rd Cir. 1943).

40. Cafeteria and Restaurant Workers Union, note 38, *supra*, 367 U.S. at 895, 81 S.Ct. at 1748.

undependable. Combined with the employee's right to written notice of official action and his immediate right of appeal to show discrimination on the basis of non-merit factors, it is clear that this procedure is designed to protect the probationary employee from arbitrary action by the State and its officers.

Hence, upon a balance of his procedural protections with his tenuous interest in his position and the State's important interest in obtaining qualified employees, it cannot be maintained that the arbitrary action offensive to principles of due process is found in the failure to include specific reasons in appellant's notice of dismissal.[41]

For the same reasons, appellant's argument that due process compels a hearing prior to discharge is not sustainable. Whether a hearing is required prior to dismissal from public employment must, again, be determined in light of the interests involved of the state and the employee and the harm threatened by a failure to hold a hearing.[42] Thus, in Goldberg v. Kelly,[43] it was held that due process requires a hearing prior to the discontinuance of welfare benefits since "termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits."[44] It is clear that the statutory right of the welfare recipient to obtain public assistance has been established at the time the benefit is sought to be cut off. This is not true of the right of a probationary employee to hold his position. Nor can the situation of such an employee be considered so precarious as that of the welfare recipient, whose circumstances become "immediately desperate."[45] Moreover, the Court in *Goldberg* strongly implied that in the case of a public employee, a hearing prior to discharge is not required, but that a hearing might constitutionally be held following dismissal.[46]

Appellant relies on several cases to support his contention that a public employee is entitled to a hearing prior to discharge. An examination of them, however, indicates that they are inapposite here. In Greene v. McElroy[47] the petitioner was an aeronautical engineer employed by a private corporation but subject to security risk regulations. The Supreme Court held that the action of the Government in revoking his security clearance pursuant to regulations promulgated by the Secretary of Defense without explicit presidential or congressional authorization, followed by a hearing based on confidential files to which the petitioner was denied access and an opportunity to challenge his accusers, constituted a denial of due process. The Court's objections were directed to the manner in which the petitioner's discharge and hearing were conducted, but were not addressed to the issue of the time at which the hearing should have been held. In addition, the petitioner in *Greene* had suffered substantial damage. The consequences of the governmental action had been both a loss of personal reputation, branding the petitioner as a communist sympathizer, and a complete loss of ability to find any other work either in his field or at a comparable salary.

---

41. In any event, in this case appellant was not ignorant of the reasons for the appellees' opinion that his work was unsatisfactory, since his appeal is predicated on the allegation that the Performance Evaluation Report states the reasons for his rating of "unsatisfactory" and his discharge.

42. See Birnbaum v. Trussell, 371 F.2d 672, 678 (2nd Cir. 1966) :
 " * * * whenever there is a substantial interest, other than employment by the state, involved in the discharge of a public employee, he can be removed neither on arbitrary grounds nor without a procedure calculated to determine whether legitimate grounds do exist (footnote omitted)."

43. 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

44. *Id.*, at 264, 90 S.Ct., at 1018.

45. *Id.*

46. 397 U.S. at 263–264 & n. 10, 90 S.Ct. 1011.

47. 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed. 2d 1377 (1959).

In Slochower v. Board of Education,[48] the petitioner, a professor of twenty-seven years' experience, entitled by statute to notice, hearing, and appeal before discharge, was automatically removed from his position under a provision of the New York City Charter after invoking his Fifth Amendment privilege against self-incrimination before an investigative committee of the United States Senate. The Supreme Court held that the exercise of the Fifth Amendment privilege was an impermissible ground for dismissal, and that the petitioner had been deprived by the summary discharge of:

> "the 'protection of the individual against arbitrary action' which Mr. Justice Cardozo characterized as the very essence of due process. Ohio Bell Telephone Co. v. [Public Utilities] Commission, 301 U.S. 292, 302 [57 S.Ct. 724, 729, 81 L.Ed. 1093]."[49]

It is apparent that the violation of due process in *Slochower* arose out of state action based on improper grounds and conducted in a manner which violated the petitioner's statutory rights.[50] Again, the time at which the hearing should have been held was not in issue. It is noteworthy that the Court went on to expressly recognize the broad powers of the state to inquire into the qualifications of its employees and to discharge those whose continued employment is "inconsistent with a real interest of the State."[51]

In Lafferty v. Carter,[52] the District Court ordered the reinstatement of two tenured and two untenured professors who had been summarily suspended from their teaching positions following their participation in campus demonstrations stemming from the removal of the chairman of their department. The District Judge found a violation of due process, stating that prior to the plaintiffs' suspensions:

> " * * * none had been notified of the nature of the charges against him, none had been given notice that he could be heard on the charges, and none had in fact been heard. Even the notice of suspension itself failed to state in any intelligible way the basis for the action;"[53]

It was held that the damage caused to the professional standing of the plaintiffs by this procedure was irreparable[54] and that the protection of their interests as teachers and researchers necessitated a hearing prior to suspension.[55]

The summary manner in which the plaintiffs in *Lafferty* were suspended is not analogous to the situation of appellant, who was provided statutory safe-

48. 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

49. *Id.*, at 559, 76 S.Ct., at 641.

50. See Olsen v. Regents of University of Minnesota, 301 F.Supp. 1356 (D.Minn. 1969), cited by appellant, holding that the discharge of a state employee without providing him a written statement of reasons and a hearing *as required by statute* violated due process. See also Lucia v. Duggan, 303 F.Supp. 112, 118 (D.Mass. 1969), holding a teacher's discharge procedure invalid as a merging of legislative and judicial functions by the school committee that removed him.

51. 350 U.S., at 559, 76 S.Ct., at 641.

52. 310 F.Supp. 465 (W.D.Wis.1970).

53. *Id.*, at 469.

54. The District Judge stated that:
" * * * when a professor is notified in writing * * * that 'the campus * * * (is) * * * off-limits to you' * * * the long range consequences to him in terms of his career and his professional standing are obviously of major proportions * * *" (at 468).
To the same effect is Roth v. Board of Regents, 310 F.Supp. 972 (W.D.Wis. 1970), aff'd 446 F.2d 806 (7th Cir., July 1, 1971).

55. But see Reed v. Franke, 297 F.2d 17, 26–27 (4th Cir. 1961) in which the court held that a hearing which followed the petitioner's discharge from the Navy did not violate due process, stating that:
"The fact that the hearing provided by statute does not precede, but follows, Reed's separation from the service does not make the hearing inadequate. The statutory review is a part of the protective procedure and due process requirements are satisfied if the individual is given a hearing at some point in the administrative proceedings." (at 27).

guards against arbitrary official action, and in fact utilized them. More importantly, the serious threat to the plaintiffs' professional status and ability to pursue their careers in *Lafferty*, which required a hearing prior to discharge, are not comparable to the situation or interest of appellant as a probationary employee in the State Civil Service. The conclusion is compelled that appellant has not demonstrated either the presence of, or damage to, a substantial interest such as would require the protection of a hearing prior to discharge in order to meet the standards of fairness consonant with due process.

For the foregoing reasons, the Order of the District Court for the Eastern District of Pennsylvania of December 19, 1969, denying appellant's motions for preliminary and permanent injunctions, will be affirmed.