## THORPE *v.* HOUSING AUTHORITY OF THE CITY OF DURHAM.

No. 712. Argued March 21, 1967.—Decided April 17, 1967.

*James M. Nabrit III* argued the cause for petitioner. With him on the briefs were *Jack Greenberg, Charles Stephen Ralston, Charles H. Jones, Jr.,* and *Michael Meltsner.*

*Daniel K. Edwards* argued the cause for respondent. With him on the brief was *William Y. Manson.*

PER CURIAM.

In November 1964, the petitioner became a tenant in McDougald Terrace, a federally assisted, low-rent public

housing project owned and managed by the Housing Authority of the City of Durham, North Carolina. The lease provided for a tenancy from month to month, and gave both the tenant and the Authority the right to terminate by giving notice at least 15 days before the end of any monthly term. On August 10, 1965, the petitioner was elected president of a McDougald Terrace tenants' organization. The next day the Authority gave her notice of termination of her tenancy as of August 31. The notice did not give any reasons for the cancellation, and the Authority declined to accede to the petitioner's demands for an explanation. The petitioner refused to vacate the premises, and the Authority thereupon brought a summary ejectment action in the Justice of the Peace Court in Durham. The Authority there obtained a judgment of eviction, which was affirmed on appeal by the Superior Court of Durham County and the Supreme Court of North Carolina.[1] We granted certiorari. 385 U. S. 967. The petitioner has remained in possession of her apartment pursuant to a stay granted by the North Carolina Supreme Court.

The petitioner contends that she was constitutionally entitled to notice setting forth the reasons for the termination of her lease, and a hearing thereon. She also suggests that her eviction was invalid because it allegedly was based on her participation in constitutionally protected associational activities.[2] We find it unnecessary

[1] 267 N. C. 431, 148 S. E. 2d 290.

[2] In the Superior Court proceedings, it was stipulated and agreed: "that if Mr. C. S. Oldham, the Executive Director of the Housing Authority of the City of Durham, were present and duly sworn and were testifying, he would testify that whatever reason there may have been, if any, for giving notice to Joyce C. Thorpe of the termination of her lease, it was not for the reason that she was elected president of any group organized in McDougald Terrace, and specifically it was not for the reason that she was elected president of any group organized in McDougald Terrace on August 10, 1965 . . . ."

to reach the large issues stirred by these claims, because of a significant development that has occurred since we granted the writ of certiorari.

On February 7, 1967, the Department of Housing and Urban Development issued a directive to local housing authorities. After reciting the fact that dissatisfaction had been expressed with eviction procedures in low-rent housing projects and that suits had been brought to challenge evictions in which the local authority had not given any reason for its action, the circular stated:

> "Since this is a federally assisted program, we believe it is essential that no tenant be given notice to vacate without being told by the Local Authority, in a private conference or other appropriate manner, the reasons for the eviction, and given an opportunity to make such reply or explanation as he may wish."

The circular goes on to require local authorities to keep future records of evictions, the reasons therefor, and summaries of any conferences held with tenants in connection with evictions.[3]

---

[3] The text of the circular is as follows:

"SUBJECT: Terminations of Tenancy in Low-Rent Projects

"Within the past year increasing dissatisfaction has been expressed with eviction practices in public low-rent housing projects. During that period a number of suits have been filed throughout the United States generally challenging the right of a Local Authority to evict a tenant without advising him of the reasons for such eviction.

"Since this is a federally assisted program, we believe it is essential that no tenant be given notice to vacate without being told by the Local Authority, in a private conference or other appropriate manner, the reasons for the eviction, and given an opportunity to make such reply or explanation as he may wish.

"In addition to informing the tenant of the reason(s) for any proposed eviction action, from this date each Local Authority shall maintain a written record of every eviction from its federally assisted public housing. Such records are to be available for review from

While the directive provides that certain records shall be kept commencing with the date of its issuance, there is no suggestion that the basic procedure it prescribes is not to be followed in all eviction proceedings that have not become final. If this procedure were accorded to the petitioner, her case would assume a posture quite different from the one now presented.[4] Compare *Wabash R. Co.* v. *Public Service Comm'n,* 273 U. S. 126, 131; *Patterson* v. *Alabama,* 294 U. S. 600, 607; *Klapprott* v. *United States,* 335 U. S. 601.

The judgment of the Supreme Court of North Carolina is accordingly vacated, and the case remanded for such

---

time to time by HUD representatives and shall contain the following information:

"1. Name of tenant and identification of unit occupied.

"2. Date of notice to vacate.

"3. Specific reason(s) for notice to vacate. For example, if a tenant is being evicted because of undesirable actions, the record should detail the actions which resulted in the determination that eviction should be instituted.

"4. Date and method of notifying tenant with summary of any conferences with tenant, including names of conference participants.

"5. Date and description of final action taken.

"The Circular on the above subject from the PHA Commissioner, dated May 31, 1966, is superseded by this Circular.

> "[s]  Don Hummel
> "Assistant Secretary for Renewal
> "and Housing Assistance"

The superseded circular of May 31, 1966, stated that the federal authorities "strongly urge, as a matter of good social policy, that Local Authorities in a private conference inform any tenants who are given [eviction] notices of the reasons for this action."

[4] Although the circular does not specify the authority under which it is issued, federal authorities are given general statutory power to make "such rules and regulations as may be necessary to carry out" federal programs for assistance to low-rent housing projects. United States Housing Act of 1937, § 8, 50 Stat. 891, as amended, 42 U. S. C. § 1408. The legal effect of the circular, the extent to which it binds local housing authorities, and whether it is in fact applicable to the petitioner are questions we do not now decide.

further proceedings as may be appropriate in the light of the February 7 circular of the Department of Housing and Urban Development. *It is so ordered.*

MR. JUSTICE DOUGLAS, concurring.

Petitioner and her children have been tenants in a low-income housing project constructed with federal and state funds and operated by the Housing Authority of the City of Durham, an agency of the State of North Carolina. The Housing Authority was established under state law and is "a public body and a body corporate and politic, exercising public powers." N. C. Gen. Stat. § 157-9 (1964). It has "all the powers necessary or convenient to carry out and effectuate the purposes and provisions" of the North Carolina Housing Authorities Law (N. C. Gen. Stat. § 157-1 *et seq.* (1964)), including the powers "to manage as agent of any city or municipality . . . any housing project constructed or owned by such city" and "to act as agent for the federal government in connection with the acquisition, construction, operation and/or management of a housing project." *Id.,* § 157-9 (1964).

The lease under which petitioner has occupied the project had an initial term from November 11 to November 30, 1964, and provided that it would be automatically renewed thereafter for successive terms of one month, provided there were no changes in income or family composition and no violations of the lease terms. The lease provides that "[t]he Management may terminate this lease by giving to the Tenant notice in writing of such termination fifteen . . . days prior to the last day of the term." The lease "shall be automatically terminated at the option of the Management" with an immediate right of re-entry and all notices required by law waived, if the tenant misrepresents a material fact in his application

or if "the Tenant fails to comply with any of the provisions of [the] lease."

As I have said, petitioner and her children moved into their home in the project on November 11, 1964. All apparently went well for eight months; the record reveals no complaints from the manager of the housing project. On August 10, 1965, petitioner was elected president of the Parents' Club, a group composed of tenants of the housing project. On August 11, 1965, the Housing Authority's Executive Director delivered a notice that petitioner's lease would be canceled effective August 31, at which time she would have to vacate the premises. No reasons were given for the sudden cancellation. The Authority merely referred to the provision of the lease stating that management may terminate the lease by giving the tenant notice 15 days prior to the last day of the term.

Petitioner requested a hearing to determine the reason for the termination; the request was summarily denied. Since she was given no reason and no hearing, petitioner refused to vacate her home. The Housing Authority brought a summary ejectment action in the Justice of the Peace Court of Durham; the court ordered that petitioner and her family be removed from their home. Petitioner appealed to the Superior Court. It was stipulated that the Superior Court could make findings and decide the case on the basis of the stipulations and affidavits. Petitioner's motion to quash claimed that her "eviction primarily resulted from her community activities as an organizer of tenants, thus constituting an unconstitutional abridgement of her freedom of expression and a denial of equal protection of the laws." Her affidavit alleged "that her eviction was prompted by [the] Manager of the Housing Authority, who wants to get her out of the project because of her efforts to organize the tenants of [the housing project] . . . ." It was stip-

ulated that the Executive Director of the Housing Authority would testify that "whatever reason there may have been, *if any,* for giving notice to [petitioner] of the termination of her lease, it was not for the reason that she was elected president of any group organized in [the housing project] . . . ." (Emphasis added.) The Superior Court found that petitioner had not been evicted due to her efforts to organize the tenants nor due to her election as president of the Parents' Club. The court held that the Housing Authority was not required to give petitioner a hearing and was not required to give any reason for the lease termination.

The North Carolina Supreme Court affirmed. 267 N. C. 431, 148 S. E. 2d 290. It held that the Housing Authority is the "owner" of the apartment and that petitioner "has no right to occupy it except insofar as such right is conferred upon her by the written lease which she and the [Housing Authority] signed." *Id.,* at 433, 148 S. E. 2d, at 291. Since petitioner had refused to quit after the Housing Authority terminated the lease, she could be evicted so as to restore to the Authority "the possession of that which belongs to it." *Id.,* at 433, 148 S. E. 2d, at 291–292. The court thought it "immaterial what may have been the reason for the lessor's unwillingness to continue the relationship of landlord and tenant . . . ." *Id.,* at 433, 148 S. E. 2d, at 292. Under the rationale of the North Carolina Supreme Court, a public housing authority, organized under state law and operating a housing project financed by federal and state funds, is assimilated to the position of a private property owner who can terminate a lease for any reason or no reason at all.

The circular upon which the Court bases its decision to vacate and remand comes from the office of the Assistant Secretary for Renewal and Housing Assistance and was issued February 7, 1967, after we granted certiorari.

It is directed to "Local Housing Authorities, Assistant Regional Administrators for Housing Assistance, and HAA Division and Branch Heads" and reads in part:

> "Since this is a federally assisted program, we believe it is essential that no tenant be given notice to vacate without being told by the Local Authority, in a private conference or other appropriate manner, the reasons for the eviction, and given an opportunity to make such reply or explanation as he may wish."

It goes on to provide that "[i]n addition to informing the tenant of the reason(s) for any proposed eviction action, from this date each Local Authority shall maintain a written record of every eviction from its federally assisted public housing," specifies the information to be contained in the record and provides that the records are to be available to HUD representatives for review.

This circular superseded a prior circular which stated that the Public Housing Administration "strongly urge[s], as a matter of good social policy, that Local Authorities in a private conference inform any tenants who are given [notices to vacate] of the reasons for this action."

This case presents two issues, neither of which is resolved by the circular. The first is whether a tenant in a publicly assisted housing project operated by a state agency can be evicted for any reason or no reason at all. The second is whether a tenant in such a housing project can be evicted for the exercise of a First Amendment right.

The circular merely provides that the tenant be told "the reasons for the eviction, and [be] given an opportunity to make such reply or explanation as he may wish." From this it may be inferred that the Housing Authority must have a reason for the eviction. But the circular does not specifically state the reasons which can support eviction; it does not state that a tenant cannot

be evicted for his stand on civil rights; it does not even broach the subject. It is argued that the circular provides that the lease can be terminated only after an administrative hearing. It certainly would be desirable if a housing authority held a hearing prior to the termination of the lease. The circular, which may be no more than a press release, does not so provide. Moreover, is there a constitutional requirement for an administrative hearing where, as here, the tenant can have a full judicial hearing when the authority attempts to evict him through judicial process? Petitioner has had a hearing in the state courts. The immediate question is what reasons can support an eviction after hearing.

Over and over again we have stressed that "the nature and the theory of our institutions of government, the principles upon which they are supposed to rest . . . do not mean to leave room for the play and action of purely personal and arbitrary power" (*Yick Wo* v. *Hopkins*, 118 U. S. 356, 369–370) and that the essence of due process is "the protection of the individual against arbitrary action." *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n*, 301 U. S. 292, 302; *Slochower* v. *Board of Education*, 350 U. S. 551, 559. Any suggestion to the contrary "resembles the philosophy of feudal tenure." Reich, The New Property, 73 Yale L. J. 733, 769. It is not dispositive to maintain that a private landlord might terminate a lease at his pleasure. For this is government we are dealing with, and the actions of government are circumscribed by the Bill of Rights and the Fourteenth Amendment. "The government as landlord is still the government. It must not act arbitrarily, for, unlike private landlords, it is subject to the requirements of due process of law. Arbitrary action is not due process." *Rudder* v. *United States*, 96 U. S. App. D. C. 329, 331, 226 F. 2d 51, 53.

The recipient of a government benefit, be it a tax exemption (*Speiser* v. *Randall*, 357 U. S. 513), unemploy-

ment compensation (*Sherbert* v. *Verner,* 374 U. S. 398), public employment (*Slochower* v. *Board of Education,* 350 U. S. 551), a license to practice law (*Spevack* v. *Klein,* 385 U. S. 511), or a home in a public housing project, cannot be made to forfeit the benefit because he exercises a constitutional right. In *United States* v. *Chicago, M., St. P. & P. R. Co.,* 282 U. S. 311, 328–329, the Court said that "the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." This was in the tradition of *Frost Trucking Co.* v. *Railroad Comm'n,* 271 U. S. 583, 594, where the Court emphasized that "If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." In *Speiser* v. *Randall, supra,* at 518, we recognized that "To deny an exemption to claimants who engage, in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech. The appellees are plainly mistaken in their argument that, because a tax exemption is a 'privilege' or 'bounty,' its denial may not infringe speech." No more can a tenant in a public housing project be evicted for the exercise of her right of association, a right protected by the First and Fourteenth Amendments. See, *e. g., NAACP* v. *Alabama,* 357 U. S. 449, 460; *Bates* v. *Little Rock,* 361 U. S. 516, 523; *Shelton* v. *Tucker,* 364 U. S. 479, 486; *Louisiana* v. *NAACP,* 366 U. S. 293, 296; *NAACP* v. *Button,* 371 U. S. 415, 430–431.

This does not mean that a public housing authority is powerless to evict a tenant. A tenant may be evicted if it is shown that he is destroying the fixtures, defacing the

walls, disturbing other tenants by boisterous conduct and for a number of other reasons which impair the successful operation of the housing project. Eviction for such reasons will completely protect the viability of the housing project without making the tenant a serf who has a home at the pleasure of the manager of the project or the housing. authority.

Here, the Superior Court found that petitioner had not been evicted because she had engaged in efforts to organize the tenants of the housing project or because she had been elected president of the Parents' Club. On appeal to the North Carolina Supreme Court, petitioner contended that the finding was .erroneous. The State Supreme Court did not pass on the finding of the Superior Court since it concluded that the Housing Authority could terminate the lease and evict petitioner for any reason.* As I have said, it is argued that the circular of the Department of Housing and Urban Development

---

*In the statement of facts preceding the names of counsel, there is an assertion that "[t]he [Superior] [C]ourt made findings of fact, each of which is supported by stipulations or by the evidence in the record." 267 N. C., at 432, 148 S. E. 2d, at 290–291. Following this is a recitation of the findings of the Superior Court, including the finding that "[w]hatever may have been the [Authority's] reason for terminating the lease, it was neither that the defendant had engaged in efforts to organize the tenants of [the housing project] nor that she was elected president of a group which was organized in [the housing project] . . . ." *Id.*, at 432, 148 S. E. 2d, at 291. My Brother WHITE argues that this amounted to an affirmance of the Superior Court's finding as supported by the evidence. But, to me, such a claim is belied by the court's statement, in the body of its opinion, that it was "immaterial what may have been the reason for the lessor's unwillingness to continue the relationship of landlord and tenant." *Id.*, at 433, 148 S. E. 2d, at 292. This indicates that the North Carolina Supreme Court did not make an independent review of the record to determine whether the Superior Court's finding as to the cause of eviction was supported by the evidence since it thought the reason for eviction immaterial,.

answers petitioner's claim that she was entitled to an administrative hearing before her lease was terminated. But petitioner has already had a hearing in the state courts. And the status of the circular, whether a regulation or only a press release, is uncertain, an uncertainty which the Court does not remove. Vacating and remanding "for such further proceedings as may be appropriate in the light of the . . . circular" therefore furnishes no guidelines for the state courts on remand, and does not dispose of the basic issue presented. I would vacate and remand to the state courts to determine the precise reason why petitioner was evicted and whether that reason was within the permissible range for state action against the individual.

MR. JUSTICE WHITE, dissenting.

I would agree with MR. JUSTICE DOUGLAS that there are reasons for which the Authority could not terminate petitioner's lease and that the ground alleged by the petitioner to be the cause of her eviction is one of them. The trial court rejected petitioner's allegations. This finding was affirmed by the North Carolina Supreme Court as supported by the evidence, although it did say, erroneously I think, that the reasons for the eviction were "immaterial."*  There could have been a more adequate record made as to the basis for the eviction but petitioner was afforded a full due process hearing in the lower court and had the opportunity to explore fully why she was evicted. I do not view the federal circular as significant to the resolution of this case, and would not remand on that basis.

I would affirm.

_____

*The statement of facts in the Supreme Court opinion, upon which I indeed rely, see footnote of my Brother DOUGLAS' concurring opinion, is, as I understand it, prepared by the court and in North Carolina is considered official.