STATE OF NEW JERSEY, PLAINTIFF, v. DOLORES THOMAS, DEFENDANT.

STATE OF NEW JERSEY, PLAINTIFF, v. MARIE WILLIAMS, DEFENDANT.

Superior Court of New Jersey
Law Divison

Decided June 4, 1970.

*Mr. Dennis Cipriano* for plaintiff (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Don X. Bancroft and Mr. Paul Vichness,* Deputy Public Defender, for defendants.

FUSCO, J. S. C. These are hearings on the admissibility of signed and oral statements allegedly given by defendants Thomas and Williams to one John Allen, an investigator for the Essex County Welfare Board. Both Thomas and Williams are charged in one-count indictments with the crime of obtaining financial assistance by false representations, better known as welfare fraud, under *N. J. S. A.* 2A:111–3.

Defendants in each instance resist the admissibility of any such statement on the grounds that the procedural safeguards established in *Miranda v. Arizona,* 384 *U. S.* 436, 474, 86 *S. Ct.* 1602 (16 *L. Ed.* 2d 694 (1967)), were not granted. They argue that the statements obtained were not voluntary, were gotten through artifice and trick, and that defendants were the target of an investigation by the welfare authorities.

The State opposes these arguments, relying on the theory that *Miranda* only applies to custodial interrogation, and that in a case such as this, in which the statements were obtained at defendants' homes, the *Miranda* rules do not apply.

There is no evidence that this point has previously been litigated in a reported case in this State.

The factual pattern in both cases is similar: Allen, an investigator, was sent to defendants' homes to obtain a

statement which might be used in a criminal proceeding against them. Allen testified on direct examination that he told defendants in each instance that they "had better tell the truth," hinting that the *welfare board* might take adverse action (as to their welfare payments, presumably) if they did not cooperate. On cross-examination, however, it was adduced that the investigator was to report to the *prosecutor's* office if he found a paramour living with defendant Thomas and if he found that defendant Williams' children were not living with her.

█ The court points out, merely in passing, that the mere fact that a paramour is living with a welfare recipient is not grounds on which aid can be eliminated or lessened, unless the man is "legally obligated" to support the child. *Lewis v. Martin,* 397 *U. S.* 552, 90 *S. Ct.* 1282, 25 *L. Ed. 2d* 561, 565 (1970). See also, *King v. Smith,* 392 *U. S.* 309, 329, 88 *S. Ct.* 2128, 20 *L. Ed. 2d* (1969).

At the outset, it is clear that defendants were targets of potential criminal proceedings. Although Allen indicated to them that only their welfare moneys were in question, in reality, possible criminal actions was the purpose of his visit and it was certainly in his mind when he called on defendants, albeit at their own homes. The situation is strikingly similar to that of the grand jury which, under the guise of a general investigation, in actuality narrows its focus on one individual called before it to testify, unaware of the true purpose of the investigation. See *State v. Browning,* 19 *N. J.* 424 (1955). In such a case, where defendant was not apprised of the subject matter of the inquiry, he could not be expected to understand or knowingly waive his privilege against self-incrimination. *State v. Sarcone,* 96 *N. J. Super.* 501 (Law Div. 1967).

And, certainly where defendant is the target of the investigation, the action by the investigator becomes a "critical stage" of the proceedings, *State v. Williams,* 97 *N. J. Super.* 573, 601 (Law Div. 1967); *Miranda, supra,* 384 *U. S.* at 467, 86 *S. Ct.* 1602, since it is one at which valuable rights

can be waived or where events might prejudice a forthcoming trial. *Cf. State v. Vogel,* 45 *N. J.* 400, 404 (1965).

It is well-established that psychological, as well as physical duress, can be the "hallmark of an unconstitutional inquisition." *Blackburn v. Alabama,* 361 *U. S.* 199, 206, 80 *S. Ct.* 274, 4 *L. Ed.* 2d 242 (1960). And see, *Haynes v. Washington,* 373 *U. S.* 503, 83 *S. Ct.* 1336, 10 *L. Ed.* 2d 513 (1963). In a situation such as this, where the investigator entered under the color of governmental sanction, the possibility of mental duress is dramatically and inexorably increased.

In a case where social welfare workers were ordered to make "midnight raids" into the homes of welfare recipients, the California Supreme Court noted:

> The persons subjected to the instant operation confronted far more than the amorphous threat of official displeasure which necessarily attends such a request. The request for entry by persons whom the beneficiaries knew to possess virtually unlimited power over their very livelihood posed a threat which was far more certain, immediate, and substantial.
> [*Parrish v. Civil Service Comm.,* 66 *Cal.* 2d 260, 57 *Cal. Rptr.* 623, 629, 425 *P.* 2d 223 (1967)]

The court must also note, in passing, that the standard for administrative searches for primarily civil purposes has recently been elevated to the same strict constitutional level as that of searches for evidence for criminal prosecutions. *Camara v. Municipal Court,* 387 *U. S.* 523, 528–529, 87 *S. Ct.* 1727, 18 *L. Ed.* 2d 930 (1967). And, where benefits were terminated as a result of refusal of recipients to allow welfare officials enter their home, an injunction was issued on behalf of recipients against the welfare officials, on the ground that a welfare home visit was an unreasonable search within the Fourth Amendment, *James v. Goldberg,* 303 *F. Supp.* 935 (S. D. N. Y. 1969). Further, where defendant in a narcotics prosecution was threatened with the loss of welfare funds for her infant children if she did not "cooperate," it was held that any statement made by her in such

a case would be considered "coerced" and the product of her "overborne" will. *Lynumn v. Illinois,* 372 *U. S.* 528, 534, 83 *S. Ct.* 917, 9 *L. Ed.* 2d 922 (1963).

The instant case falls within this framework: there is a clear threat of loss of government benefit (in actuality, the spectre of criminal prosecution) if the recipient does not "cooperate" with the authorities. It is clear to this court that the defendants were "tricked, threatened and cajoled" (*Miranda, supra,* 384 *U. S.* at 476, 86 *S. Ct.* 1602) by the trick and artifice of the welfare department in obtaining the signing of a statement they otherwise would not have signed had they had their own free will and had they been advised of the purpose of the statement.

Similarly, it is too late in the day for the State to argue that defendants, merely because they are welfare recipients, may be restricted in their exercise of constitutional rights. Just as liberties of religion and expression cannot be infringed by the denial of or placing of condition upon a governmental benefit or privilege, *Sherbert v. Verner,* 374 *U. S.* 398, 404, 83 *S. Ct.* 1790, 10 *L. Ed.* 2d 965 (1963), neither can the liberties guaranteed by the Fifth and Sixth Amendments be limited by the fact that the individual involved receives governmental benefits. *Cf. American Communications Ass'n v. Douds,* 339 *U. S.* 382, 70 *S. Ct.* 674, 94 *L. Ed.* 925 (1950); *Speiser v. Randall,* 357 *U. S.* 513, 526, 78 *S. Ct.* 1332, 2 *L. Ed.* 2d 1460 (1958) ("conditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms"); *Thorpe v. Housing Authority of City of Durham,* 386 *U. S.* 670, 678–679, 87 *S. Ct.* 1244, 1248, 18 *L. Ed.* 2d 394 (1967) (Douglas J. concurring).

This is no less binding when the benefits involved are welfare benefits. "In welfare, the government should not be allowed to impose any conditions that would be unconstitutional if imposed on persons not on welfare: the government cannot 'buy up' constitutional rights." Handler, "Controlling Official Behavior in Welfare Administration,"

54 *Cal. L. Rev.* 479 (1966), in *Dodyk et als., Law and Poverty* 225, 226 (1969). See also, Note, "Rehabilitation, Investigation and the Welfare Home Visit," 79 *Yale L. J.* 746, 760 (1970).

██ Under the circumstances present, then, the court has no hesitancy in deciding that the *Miranda* warnings must be applied to such a situation in which a defendant is the target of a prosecutorial investigation, where defendant is under duress as a result of the presence of governmental authority, and where trick is used by the government in obtaining the needed statement. The fact that the statements were not obtained in a police stationhouse does not eliminate the need for these warnings to be given. "Decisions concerning human rights are too important to be left to the public welfare workers and public administration officials without the aid of the law." Reich, "Individual Rights and Social Welfare: The Emerging Legal Issues," 74 *Yale L. J.* 1245, 1257 (1965).

Under *Miranda,* a defendant must be informed of the nature of the charges against him with specificity. He must be told that he has the right to remain silent; that if he chooses to answer questions he may stop at any time; that anything he says may be used against him; that he may consult a lawyer and has access to a lawyer throughout the entire questioning, and, if he cannot afford a lawyer, one will be provided for him. *Miranda, supra.* 384 *U. S. at* 444–445, 86 *S. Ct.* 1602.

In the cases before the court, the form which defendants signed concluded as follows:

I make this affidavit of my own free will, my rights have been explained to me and I fully understand the meaning of supplying the necessary information.

This statement is fatally inadequate in that it does not contain the necessary warnings with either specificity or clarity.

These rights may be waived, provided they are waived voluntarily, knowingly and intelligently. Such a waiver will never be presumed from silence or from the fact that a statement was obtained. *Id.* at 475, 86 *S. Ct.* 1602. A waiver is an "*intentional* relinquishment or abandonment of a *known* right or privilege," (emphasis added), *Johnson v. Zerbst,* 304 *U. S.* 458, 464, 58 *S. Ct.* 1019, 82 *L. Ed.* 1461 (1938). Even where defendant was an attorney, and presumably skilled in the law, the presumption against waiver was still indulged. *Glasser v. United States,* 315 *U. S.* 60, 70, 62 *S. Ct.* 457, 86 *L. Ed.* 680 (1942). A waiver must be a "free, deliberate and understanding foregoing" of one's rights. *Green v. State,* 245 *A.* 2d 147, 149 (Me. Sup. Jud. Ct. 1968).

It is clear that there was no such intentional or voluntary waiver here. The statements obtained from defendants were given "in submission to authority, rather than as an understanding and intentional waiver of constitutional right." *Johnson v. United States,* 333 *U. S.* 10, 13, 68 *S. Ct.* 367, 368, 92 *L. Ed.* 436 (1948) (search was consented to after governmental officials identified themselves as such). Indeed, "intimidation and duress are almost necessarily implicit" in situations such as this. *Cf. Judd v. United States,* 89 *U. S. App. D. C.* 64, 190 *F.* 2d 649, 651 (1951). And, of course, this applies with equal weight where the government intrusion is to obtain a statement in violation of the Fifth and Sixth Amendments as where the intrusion is to conduct a search violative of the Fourth. See *James v. Goldberg, supra.*

As there was no voluntary waiver in the instant case, the standards of *Miranda* were not complied with by the welfare investigator, acting under the color of the State. Therefore, any statements taken from defendants cannot be used in any criminal prosecution of them stemming from this welfare investigation.

The motions by defendants to suppress the statements will be granted.