Erle E. PEACOCK, Jr., Plaintiff,

v.

BOARD OF REGENTS OF the UNIVER-
SITIES AND STATE COLLEGES OF
ARIZONA et al., Defendants.

No. 74-123 PHX-HBT.

United States District Court,
D. Arizona.

May 3, 1974.

McLane & McLane, Jeremy E. Butler of Lewis & Roca, Phoenix, Ariz., for plaintiff.

William R. Jones, Jr., Phoenix, Ariz., Jack J. Rappeport, Sp. Counsel for the Atty. Gen., Tucson, Ariz., for defendants.

## ORDER RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

TURRENTINE, District Judge.

This action was instituted by Dr. Erle Peacock, Jr. for money damages and equitable relief against the above named defendants. The suit stems from the termination of Dr. Peacock as Head of the Department of Surgery, College of Medicine, University of Arizona, on October 25, 1973, and his subsequent suspension as Professor of Surgery on February 11, 1974.

Pending trial on the merits, plaintiff has asked this court for a preliminary injunction ordering his immediate reinstatement as Head and Professor of Surgery at the College of Medicine.

### I. Jurisdiction

Plaintiff bases federal jurisdiction on 28 U.S.C. § 1331 (Federal question) and 28 U.S.C. § 1343(3) and (4) (Civil rights). The causes of action are alleged to arise under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution. The matter in controversy is alleged to exceed $10,000.

Defendants have interposed a jurisdictional objection with respect to defendant Board of Regents. Defense counsel argues that the Board of Regents is not a proper defendant under § 1983 and that the United States Constitution does not specifically provide anyone with a right of action absent reference to the Civil Rights Act of 1871, 42 U.S.C. § 1981 et seq.

■ For the purposes of this order, and in view of the fact that this court has jurisdiction over the Regents themselves, both as individuals and in their representative capacities, Whitner v. Davis, 410 F.2d 24 (9th Cir. 1969) and also in light of City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L. Ed.2d 109 (1973), this court decides that jurisdiction over the Board of Regents is properly averred under 28 U.S. C. § 1331.

### II. Brief history

Prior to joining the University of Arizona's faculty, Dr. Peacock was Professor of Surgery at the University of North Carolina. During 1968 plaintiff was persuaded by Dr. DuVal, a former acquaintance, to join the medical faculty at the University of Arizona as professor of surgery and to establish and head a department of surgery.

After arriving at the University of Arizona in early 1969, plaintiff recruited outstanding surgeons to join him, and he organized what is generally recognized as a unique and innovative academic and clinical program at the College of Medicine.

In April 1972, plaintiff received his first written notice that his performance as Head was less than satisfactory. Dr. DuVal, as Dean of the College of Medicine, wrote that certain actions taken by plaintiff appeared to reflect an attitude that the Department of Surgery's welfare took precedence over that of the College of Medicine. Dr. DuVal further indicated that if such interpretation were correct then those actions were a "serious breach and overextension . . . of responsibilities" and would substantially undermine the confidence that Dr. DuVal had had in plaintiff.

Matters drifted until May 11, 1973, when Dr. DuVal returned to the University campus from an assignment in

Washington, D. C. He was immediately apprised of a report made by the Liaison Committee of the Association of American Medical Colleges and the American Medical Association [1] which was critical of the operation of the department of surgery. Dr. DuVal at that time asked Dr. Peacock to resign as Head of the Department of Surgery. Over the next several weeks Dr. DuVal and Dr. Peacock conferred as to how this could be most satisfactorily accomplished from Dr. Peacock's point of view. During these discussions Dr. DuVal repeatedly told plaintiff that the request for resignation in no way reflected on his excellence as a surgeon, instructor and researcher, but rather was required because of his inability to work harmoniously and cooperatively with his fellow heads at the College of Medicine. It should be noted that these discussions were on a very personal and confidential basis. Despite the dissatisfaction with the plaintiff's performance as Head, and during the negotiations regarding the time and manner of termination, the University renewed the plaintiff's contract as Professor and Head of the Department of Surgery through June 30, 1974.

In the months leading up to the dismissal, the parties continued to engage in dialogue regarding the problems presented by Dr. Peacock's continuation as Head and regarding the least painful way of securing a "transition" in the leadership of the Department. Finally convinced that Dr. Peacock would not resign, the University dismissed plaintiff without notice and hearing as Head of the Department of Surgery on October 25, 1973.

Between October 25 and January 31, 1974, Dr. DuVal acted as Head of the Department of Surgery. Although meetings were called to generate support for plaintiff, the school and the department functioned in an acceptable manner. However, during these months lines were drawn, and statements were made that reduced the chances of peaceful resolution. Repeatedly, Dr. DuVal had to defend and explain publicly the actions of the Administration. Plaintiff, on the other hand, orchestrated an effort, both within and without the walls of the campus, to win his reinstatement. Significantly, on December 5, 1973, the University offered plaintiff (although maintaining that he had no right to it) a hearing to determine the justness of its decision to terminate. Plaintiff ignored this offer.

On January 31, 1974, defendant Dr. Lindsey was appointed as Acting Head of the Department of Surgery, and what had before been a simmering yet containable conflict erupted into a bold contest of authority. On the basis of the record thus far it is not evident to what extent plaintiff was responsible for the contempt and disrespect which greeted Dr. Lindsey on his assuming the position as Acting Head. It is clear, however, that plaintiff enjoyed immense loyalty within the Department and that a considerable amount of tension would have existed without any effort on plaintiff's part.

Following Dr. Lindsey's appointment, the atmosphere in the Department, as characterized by the defendants in their testimony, was "tense and explosive." While such a description may be overdrawn, it appears to this court that the Department was in a state of turbulence and that its ability to carry out its educational functions was substantially impaired.

Faced with this situation, the Administration decided that two competing centers of authority and allegiance could not exist within the Department. Consequently, upon the recommendation of both Drs. Lindsey and DuVal, the Ad-

1. The Association of American Medical Colleges and the American Medical Association jointly participate in the accreditation of schools of medicine through the agency of the Liaison Committee which consists of six representatives from each of the Association's councils, two "public" members, and one representative of the Federal government.

ministration suspended plaintiff, with pay, as Professor of Surgery and informed him of the manner in which to set in motion the available grievance procedures.

### III. Preliminary Injunction

█ In view of the plaintiff's contentions, it is imperative that this court state what this case does not involve. It does not involve academic freedom. Bickering and disputes between heads of departments is not protected speech within the First Amendment. Plaintiff directed the Department of Surgery in apparent disregard of the interest and well-being of other departments. He applied for funds independently rather than jointly in those areas where departmental jurisdiction overlapped. He acted to increase the number of patients for the Department of Surgery without consulting other department heads and with little care that other departments were being deprived of patients. Upon dismissal as Head, plaintiff acted to seize and retain the authority of Department Head. The verbalization of aggressive conduct does not bring plaintiff within the safe harbor of the First Amendment. Watts v. Bd. of Curators, University of Mo., 363 F.Supp. 883 (W. D.Mo.1973). A university has the right to expect a professor to follow instructions and to work cooperatively and harmoniously with other members of the faculty. Chitwood v. Feaster, 468 F.2d 359 (4th Cir. 1972).

█ This case does not involve the extent to which democratic principles are relevant in academe. Plaintiff argues that a department head is a representative of the department faculty and as such must be accountable to, and only to, that constituency. While such a university organization could be defensible as a matter of educational policy, it does not appear to be required either by the Constitution or any statute. The character or nature of department head is not a matter for this court to decide, rather it is a matter to be left to collective bargaining and private persuasion.

The main issues are:

1. Whether the plaintiff has an interest protected by due process either as Head or Professor,

2. Whether due process requires a pretermination or presuspension hearing, and

3. If so, whether reinstatement is the only relief available.

█ Before a preliminary injunction can be granted, it is incumbent upon a court to consider four factors:

1. The threat of irreparable harm to plaintiff if the injunction is not granted;

2. The injury that granting the injunction would inflict on the opposing party;

3. The probability that petitioner will succeed on the merits at subsequent trial; and

4. The larger public interest.

Ross-Whitney Corp. v. Smith Kline & French Labs., 207 F.2d 190 (9th Cir. 1953); Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970), aff'm on other grounds 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L. Ed. 834 (1944).

In analyzing plaintiff's contentions that he was deprived of both liberty and property without due process of law by his termination as Head and suspension as Professor, the two acts will be separately treated.

### A. Headship

#### 1. Liberty interest

█ Plaintiff alleges a violation of a protected liberty interest in the manner in which his employment as Head was terminated. Liberty as protected by the Fourteenth Amendment is "not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life . . . and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." Board

of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) quoting Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

Attaching a badge of infamy is a restraint of liberty. Plaintiff, however, was never accused of any serious delinquency or charged with unsavory character traits such as dishonesty or immorality. In no way has plaintiff's good name or reputation, honor or integrity been impugned by defendants. The University and witnesses testifying in this motion expressed nothing but admiration and respect for Dr. Peacock. "Brilliant" and "outstanding" were adjectives frequently used by the witness in this case when describing plaintiff as a teacher, surgeon and person.

Future employment has not been foreclosed plaintiff, though it is understandable that plaintiff has received no offers of employment from other universities as head of a department or professor of surgery during the pendency of this controversy. Indeed, it is not likely that plaintiff will receive such offers until this dispute is brought to a final resolution.

■ On the state of the record, plaintiff has failed to show that his dismissal as Head of the Department of Surgery violated any protected interest in "liberty."

2. Property interest

Plaintiff alleges a property interest in his employment as Head on various grounds. First, that he has an interest secured by a contract with the University. Second, he contends that his expectancy was of employment as head for 6–10 years since that was the period of time that he and Dr. DuVal estimated as necessary to fully establish the Department of Surgery. Third, plaintiff argues that the method commonly used at the University to select heads, i. e. faculty consultation, created in heads so selected a protected interest.

Defendants, on the other hand, argue that headships are administrative positions; that heads serve at the pleasure of the Administration and their dismissal must remain within the Administration's unfettered discretion. Further, defendants claim that it is the "common law of the campus," Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972), that heads serve at the pleasure of the University.

■ This court rejects plaintiff's contention that the 6–10 year time period discussed during preliminary negotiations preceding his arrival at the University constitutes a protected expectancy. Plaintiff was not given a contract to establish the Department of Surgery; rather he was employed as head on a year-by-year basis. While it is true that plaintiff gave up a rewarding and comfortable position at the University of North Carolina to come to Arizona, such conduct merely indicates plaintiff's confidence in his abilities and his subjective expectancy that all would proceed well in Arizona. Such a subjective expectancy is not a "legitimate claim of entitlement" as required by *Roth, supra,* before due process protections apply.

■ Next this court rejects plaintiff's argument that the method of selection of heads usually used at the University of Arizona vested in plaintiff a protected property right. The fact that plaintiff has departmental faculty support, the extent of which is a matter of some dispute, does not constitute a legitimate claim of entitlement to the headship.

■ If plaintiff is to have a protected property interest in his position as Head of the Department of Surgery, it must come from his written contract of employment or appointment for the year beginning July 1, 1973, and ending June 30, 1974. A term of employment set by contract has been recognized as a property interest which the state cannot extinguish without conforming to the dictates of procedural due process. Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Roth, supra;* Hostrop v. Bd. of Junior College Dist.

No. 515, etc., Ill., 471 F.2d 488 (7th Cir. 1972).

■ The document entitled "Notice of Appointment" secured plaintiff's service as both Professor and Head for the academic year 1973. It stated the compensation plaintiff was to receive, and it required acceptance by the plaintiff. It would be anomalous to accept that plaintiff was under contract as Professor but that his employment as Head was at the will of the Administration. It appears to this court's satisfaction that the notice was in effect a contract and that plaintiff had a protected property interest in his employment as Head for the 1973 academic year.

### 3. Relief

■ "Once it is determined that due process applies, the question remains what process is due . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The character of the relief may depend on the importance of what the plaintiff stands to lose. Thorpe v. Housing Authority, 386 U.S. 670, 87 S. Ct. 1244, 18 L.Ed.2d 394 (1967).

■ It is well settled that, *absent special circumstances,* due process requires that one who is deprived of a protected interest be given a hearing prior to the deprivation. *Roth, supra;* Skehan v. Bd. of Trustee of Bloomsberg St. Col., 358 F.Supp. 430 (M.D.Pa.1973).

■ Nothing in the record indicates that as of the date of plaintiff's dismissal as head of the department, special or extraordinary circumstances required that plaintiff be dismissed without a prior hearing. Certainly the facts are far removed from those existing in Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

Nevertheless, plaintiff's protected interest is of short duration and he has not suffered any loss or reduction in pay. While this court cannot say that it would be futile to order a due process hearing, Kota v. Little, 473 F.2d 1 (4th Cir. 1973), it does appear that the dispute is so intractable, Zimmerer v. Spencer, 485 F.2d 176 (5th Cir. 1973) and the threat to the University's normal functioning so great, Lucia v. Duggan, 303 F.Supp. 112 (D.Mass.1969), that to order full reinstatement would be an imprudent use of this court's equitable power.

### 4. Order

The University of Arizona is ordered to reinstate plaintiff as Head of the Department of Surgery but may at its option relieve him from performing any duties as head pending a hearing in accordance with the rules and regulations, Faculty Manual, Chap. VIII 13 ed., regarding the dismissal of tenured [2] faculty members.

### B. Professorship

### 1. Property and liberty interest

■ It is so clear as to require no citation to authority that a tenured professor has a protected property interest. Plaintiff was a tenured professor when he was suspended with pay as Professor of Surgery on February 11, 1974. This court agrees with Lafferty v. Carter, 310 F.Supp. 465 (W.D.Wis.1970) that when a professor is separated from the mainstream of his occupation, most especially a surgeon for whom frequent practice is vital, the consequences are major even though not measurable in financial terms. Therefore, the fact that plaintiff has suffered no immediate financial loss in no way defeats the requirement that due process i. e. rudimentary fairness, apply.

For reasons previously stated and equally valid with respect to the professorship, this court decides that no liber-

[2] There is in Arizona no tenure in a strict legal sense but this court uses it here to refer to what under Arizona law is designated as "continuing" appointments. Throughout this order, "tenure" will be used in the Arizona sense unless otherwise stated.

ty interest was violated and no badge of infamy attached by defendants' suspension of plaintiff.

The question before this court is whether defendants denied plaintiff due process by failing to afford him a due process hearing before suspending him as professor.

### 2. Prior hearing

 Due process requires a hearing prior to a deprivation of a protected interest absent extraordinary circumstances.[3] Defendants maintain that following Dr. Lindsey's appointment on January 31, 1974, several incidents occurred which created a "tense and explosive" atmosphere within the Department of Surgery, and required that the University act in a summary fashion. Among other disturbing events disclosed in the record, Dr. Lindsey was prevented from presiding, as he was entitled to as head, over a departmental meeting; conferences scheduled in one room by Dr. Lindsey were moved to other rooms either by plaintiff or his supporters. All of this was against a backdrop which included contracting the leading candidate for the College's deanship in an effort either to win his support or to obstruct his employment as dean and meetings in which various of the plaintiff's supporters were delegated tasks of approaching various publics, e. g. Senator Goldwater, to intercede on plaintiff's behalf.

As a result there was no specification of charges, no advance notice and no hearing preceding plaintiff's suspension. The University did, however, inform plaintiff that redress was available through the procedures set out in the Faculty Manual and that a hearing would be provided upon request. Plaintiff has thus far failed unequivocally to accept the University's offer arguing that the hearing must precede the suspension.

 There are limitations on the kind of action the University can take, even in an emergency situation. It must adequately respond to the emergency in the manner least intrusive on the plaintiff's rights. Even if defendants violated due process in not tailoring the intrusion to the situation on campus, this court would not order the relief requested because the good accomplished by reinstatement would be outweighed by the harm done to the University Hospital.[4] A hospital is a finely balanced mechanism and surgery requires an unusual degree of cooperation and loyalty among the members of the surgical team. The conflict between the parties has escalated to the point that it is clear that it would be most difficult for plaintiff to fully reintegrate himself into the workings of the hospital unless through the mutual agreement of the parties.

### 3. Order

It is, therefore, ordered that the University continue effective its offer to plaintiff to hold a hearing regarding his status as Professor in accordance with the University's rules and regulations.

Plaintiff shall have ten days from the date of this order to request a hearing in accordance with the prescribed procedure of the University of Arizona. The University shall afford plaintiff such hearing within ten days of receipt of such request, unless the parties mutually agree as to a continuance thereof.

3. *Cafeteria Workers, supra,* is the leading case regarding the "special circumstances" test, and although it has suffered recent criticism, see McNeill v. Butz, 480 F.2d 314 (4th Cir. 1973), it has a residual vitality as attested to by Olson v. Regents of the University of Minnesota, 301 F.Supp. 1356 (D. Minn.1969) and Moore v. Knowles, 333 F. Supp. 53 (N.D.Tex.1971), rev'd on other grounds, 466 F.2d 531 (5th Cir. 1972).

4. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L. Ed. 817 (1951).