545 P.2d 427

**Brack G. HATTLER, Jr., M.D., William C. Trier, M.D., Marlys Witte, M.D., Charles L. Witte, M.D., Philip L. Gildenberg, M.D., John W. Madden, M.D., D. Scott Clark, M. D., Walton Van Winkle, Jr., M.D., Appellants,**

**v.**

**John P. SCHAEFER, Ph.D., Merlin K. Duval, M.D., Neal Vanselow, M.D., Douglas H. Lindsey, M.D., Jack R. Williams, Governor of the State of Arizona, Weldon P. Shofstall, Superintendent of Public Instruction, James E. Dunseath, Gordon Paris, Dr. Paul L. Singer, Sidney S. Woods, Kenneth G. Bentson, Ralph Bilby, Rudy E. Campbell, Margaret M. Christy, Individually and in his or her capacity as a member of the Board of Regents of the Universities and State Colleges of Arizona, Appellees.**

**No. 2 CA–CIV 1970.**

Court of Appeals of Arizona, Division 2.

Jan. 30, 1976.

Rehearing Denied March 16, 1976.

Review Denied April 13, 1976.

Lewis & Roca by Jeremy E. Butler, John P. Frank and Susan M. Freeman, Phoenix, for appellants.

Bruce E. Babbitt, Atty. Gen., by Jack J. Rappeport and Robert O. Lesher, Sp. Asst. Attys. Gen., Tucson, for appellees.

OPINION

HATHAWAY, Judge.

This appeal is from a summary judgment in favor of appellees as to the claim of appellants, faculty members of the Department of Surgery, University of Arizona College of Medicine, that they are entitled to select their department head.

Dr. Erle Peacock, Jr., was discharged as head of the Department of Surgery in October 1973. Plaintiffs-appellants are members of that department who supported Dr. Peacock and the principle "that they have

the right to a strong and perhaps determinative voice in the selection of the Head of the Department of Surgery." Shortly before his discharge, appellants elected Dr. Peacock to head the department, but were advised by Dr. DuVal, then acting Dean of the College of Medicine, that Dr. Peacock was unacceptable.

Subsequent to Dr. Peacock's discharge, Dr. DuVal invited the members of the department to submit further candidates to be considered by the administration for appointment. Appellants declined, taking the position that they had legitimately chosen Dr. Peacock. Thereafter, the majority of department members did not participate in later selection proceedings instituted by Dr. DuVal.

Douglas H. Lindsey, M.D. was appointed acting head of the Department of Surgery by Dr. DuVal, and was unilaterally reappointed by Dr. Schaefer, University of Arizona President, after the U.S. District Court ordered the university to reinstate Dr. Peacock with the proviso that he could be relieved of his duties pending a legal termination with a hearing. *Peacock v. Board of Regents of Universities and State Colleges of Arizona,* 380 F.Supp. 1081 (D.Ariz.1974), aff'd 510 F.2d 1324 (9th Cir. 1975).

A short time after Dr. Lindsey's reappointment, 20 of the 25 members of the Department of Surgery wrote to the dean of the College of Medicine, Dr. Vanselow, requesting a change of acting headship from Dr. Lindsey to Dr. Walter Van Winkle. University President Schaefer was also requested to take action to replace Dr. Lindsey. Neither responded to the request. Thereafter Dr. Lindsey submitted his resignation as acting head of the department, which was accepted by Dean Vanselow, effective upon the naming of another acting head.

After Dr. Lindsey's resignation, Dr. William C. Trier was elected acting head of the department by the members present at a department meeting. Dean Vanselow was informed of the election of Dr. Trier, but chose to ignore the matter and instituted proceedings to locate a permanent department head.

On July 31, 1974, appellants filed suit in Pima County Superior Court against the university administrators and the Board of Regents alleging that they were denying the department its right to valid representation. The complaint alleged that it is the common law of the University of Arizona that the department head of a strong department is appointed by the president after an election or other democratic selection process by the faculty members and that under the campus common law, the head of a strong department is not appointed unless he has the support of a majority of the members of the department.

A defense motion to dismiss for failure to state a claim or, in the alternative, for summary judgment was filed on December 24, 1974. The tenor of the defense motion was that the court lacked jurisdiction because the selection of department heads was wholly an executive determination. On February 10, 1975, the court granted the defendants' motion for summary judgment.

Appellants first call upon us to determine whether campus common law is material and determinative of the rights and duties of faculty members in respect to choice of department heads. We find that it is not.

The Arizona Board of Regents, a constitutional body,[1] is charged with the governance of the three state universities. A. R.S. § 15–725 provides:

"A. The board shall:

1. Enact ordinances for the government of the institutions under its jurisdiction.

1. The Constitution of Arizona, Art. 11 § 5 states:

"The regents of the University, and the governing boards of other State educational institutions, shall be appointed by the Governor, except that the Governor shall be, ex-officio, a member of the board of regents of the University."

2. Appoint and employ a president or presidents, vice presidents, deans, professors, instructors, lecturers, fellows and such other officers and employees it deems necessary.

\*     \*     \*     \*     \*     \*

4. Remove any officer or employee when in its judgment the interests of education in the state so require."

The concomitant powers of hiring and removing department heads are granted in paragraphs 2 and 3 in the above statute. The board's power to remove a department head was recognized in *Peacock v. Board of Regents*, 510 F.2d 1324 (9th Cir. 1975). The university administration exists to assist the board in its administrative responsibilities and in furtherance of its responsibilities.

■ Appellants seek support in A.R.S. § 15–702(B) which states:

"The faculties of the colleges shall have and exercise, in the government of their respective colleges, such powers and authority as the board of regents prescribes."

Appellants' argument that the Board of Regents may, through ordinances, delimit the authority the faculty may exercise in determining its department heads, but that the legislature has reposed governing authority in the faculty, inverts the source of authority. The statute clearly and simply recognizes governing authority in the Board of Regents and empowers that body to authorize a faculty voice in intra-collegiate government. Appellants also claim the right to select their own department head by virtue of "the common law of the campus." They contend that the practice of soliciting input from a department in searches for an acceptable department head has ripened, through custom and usage, into a right to compel appointment of their choice. Custom and usage is a contract term. It is used to interpret the words of a contract and to give effect to the intentions of the parties. Corbin on Contracts,

Vol. 3, § 556 (1960). It has no application here as contract rights are not involved.

Insight into the selection procedure and factors considered in that undertaking is aided by the following excerpts from Dean Vanselow's deposition:

"Q. What is the basis of your opposition to the democracy among the members of the department?

A. There are several bases. First of all, I think it would lead to academic mediocrity, to mediocrity in medical schools. Secondly, I believe that because members of a medical school have to work together, faculty members and departments in teaching research and patient care, that we cannot have individual departments going individual ways. And thirdly, every other medical school in the country does not permit department heads to be elected, and I believe we would have a very difficult time recruiting department heads if we were to elect them.

\*     \*     \*     \*     \*     \*

Q. . . . I think, as I interpret this, it's your position because of the inter-relationship between departments in the medical school, that the head of a department must be somebody that is acceptable to other heads, is that—

A. That's correct.

Q. So this then, means that here at the University of Arizona Medical School, that the heads of all the other departments would be entitled to veto the head of the department of surgery, is that what it comes to?

A. No, I think they would be entitled to provide the Dean with advice in that regard.

\*     \*     \*     \*     \*     \*

A. I think if all the department heads were opposed to the person, I

would have to give very, very, serious consideration not to appointing that person.

Q. And would you explain to me again, why that is? I don't quite honestly understand why the—a department head, let's say in one of the basic sciences should have any say over who the department head is in surgery.

A. In a medical school we have to first of all teach together. We do not have a curriculum like they do in literature, science, and arts, where a department of romance languages, for example, may never have to have any contact with the department of political science.

Our departments do teach together in an interdisciplinary fashion. We have a single curriculum and departments must work together to teach within it. So they have to get along in teaching.

Secondly, we do interdisciplinary research in Dr. Witte's unit, for example, the clinical research unit, although that is a grant given to the department of surgery research within that unit, it is done by a number of departments, so departments have to be able to get along to that extent and probably the most important thing is that the faculty of a medical school takes care of patients and we must have people who can work together in patient care.

I don't think I would want to be a patient in a hospital where that were not the case.

\*   \*   \*   \*   \*   \*

Q. So, in order to avoid friction between departments on the teaching within a particular classroom then, it is your position that the department heads must be all acceptable one to the other?

A. They must be able to work as a team.

Q. Now, the other area that you discussed with me was patient care, and once again so that I understand your position, are you saying that it is necessary for the department heads at the University of Arizona Medical School to agree as to who will be the other department head, so that a patient will get—well, there will not be a malpractice, is that what we're talking about?

A. Possibly. We are a closed-staff hospital in effect. If there is a department—well, if I am an internist and need a consultation from a surgeon, and the department heads have entirely different philosophy, or two departments are at odds with each other and fighting with each other, I think it makes patient care difficult.

\*   \*   \*   \*   \*   \*

Q. Dr. Vanselow, let me understand the department heads, if I may, and their function. Do they meet as a group?

A. Yes, they do.

Q. And how often do they meet?

A. Once a week.

Q. And do you attend those meetings?

A. Yes, I do.

Q. And do you preside over them?

A. Yes.

Q. We're talking about a group of what, 10 or 12?

A. Fifteen.

Q. Fifteen people now, right? And you're not telling me that they are always in accord with each other as to what they think is best?

A. Absolutely not.

Q. And setting aside Erle Peacock, are there not some pretty healthy

disagreements among the department heads as to procedures to be followed, research, teaching, and so on?

A. Yes, but in general once concensus has been reached most people are willing then to go on and live within that concensus.

Q. And is it also your position, sir, that department heads, whoever they are, or however they are selected, serve at your pleasure?

A. It is."

Appellees concede that department heads are customarily appointed, or attempted to be appointed, who meet with the acceptance of the department. As was pointed out by Dean Vanselow, however, many additional factors are also considered.

We find the authorities in support of appellants' "campus common law" theory of no help. For example, in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972), the court found that a teacher who had been employed for 10 years in a system which, although not having a formal tenure system, had a de facto or "common law" equivalent of tenure, was entitled to a hearing to determine if he was denied a benefit on the basis of exercising his freedom of speech and to establish that in fact a de facto system of tenure, among other things, existed at the institution.

Appellants, on the other hand, are attempting to relegate unto themselves authority to name their department head contrary to clear statutory mandate. Their view typifies the tail wagging the dog, which may occur under distressed conditions, but is neither normal nor desirable.

In view of our holding, we deem it unnecessary to consider the second question presented. Appellants' complaint concerning approval of appellees' statement of costs is without merit.

Affirmed.

KRUCKER, J., and HAIRE, Chief Judge, Division 1, concur.